## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | |
|---|---|
| **ROY LEE WARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 3:25-CV-00800-CCB-SJF** |
| | ) |
| **LLOYD ARNOLD, COMMISSIONER** | ) |
| **INDIANA DEPARTMENT OF** | ) |
| **CORRECTION AND** | ) |
| **RON NEAL, WARDEN** | ) |
| **INDIANA STATE PRISON,** | ) |
| | ) |
| **Defendants.** | ) |

### DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT

Defendants file this answer in accordance with this Court's order to file an answer by September 23, 2025. Dkt. 11. The Court has since ordered Plaintiff Roy Lee Ward to show cause why judgment on Count 4 should not be entered in the defendants' favor. Dkt. 20. Judgment should be entered against Ward given the record. Also, Ward's complaint violates Federal Rule of Civil Procedure 8 because it is not a short and plain statement, instead full of lengthy paragraphs that are often argumentative. Accordingly, Defendants assert that the complaint could be stricken because it violates Rule 8.

Defendants answer Plaintiff's Complaint (Dkt. 1) as screened by this Court (Dkt. 11) as follows:

### I.    INTRODUCTION

1. Roy Ward has been convicted of capital murder for offenses occurring in Spencer County, Indiana. After his guilty pleas to capital murder and rape, a

Clay County, Indiana jury recommended that Ward be sentenced to death, a sentence imposed on June 8, 2007. The Supreme Court of Indiana has scheduled Ward's execution to occur on October 10, 2025, before sunrise.

**ANSWER:** Defendants admit the allegations contained in paragraph 1.

2. Indiana's lethal injection protocol has two approved methods of execution. Method 1 is a three-drug lethal injection process involving successive injections of a drug meant to cause unconsciousness (Sodium Pentothal, Pentobarbital or Brevital), a drug meant to paralyze muscles to stop breathing (Pancuronium Bromide or Vancuronium Bromide), and a drug meant to stop the heart by interfering with the body's electrical signals (Potassium Chloride). Method 2 is a one-drug lethal injection process involving a high dose of one drug, pentobarbital.

**ANSWER:** Defendants admit the allegations contained in paragraph 2.

3. Because post-mortem toxicology results in Indiana's two most recent executions revealed high levels of pentobarbital, it is likely Indiana used Method 2 to carry out those executions and will also use Method 2 to carry out Ward's execution. Indiana has not publicly confirmed which method of execution it intends to use to execute Ward, but very recent, heavily redacted responses to long-standing public records requests indicate Indiana is purchasing just one drug to carry out executions, pentobarbital, which reinforces the conclusion that Indiana is now using Method 2 to carry out executions.

2

**ANSWER:** Defendants admit Indiana used Method 2 to carry out its two most recent executions and that it intends to use Method 2 to carry out the execution of Mr. Ward. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 3 of and therefore deny the same.

4. The setting of Ward's execution date comes on the heels of Benjamin Ritchie's execution on May 20, 2025, an execution during which Ritchie lurched upward, as if to sit up, in a spasm that occurred after the lethal injection drug pentobarbital was administered. Ritchie's lurching lasted for multiple seconds and so startled his spiritual advisor, who sat next to him in the execution chamber, that the spiritual advisor pushed back in his chair causing it to slide backward. Ritchie's reaction is inconsistent with the normal effects of unadulterated pentobarbital, a powerful sedating barbiturate which in high doses acts as an anticonvulsant. Something went obviously wrong.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the assertions of what the spiritual advisor or other witnesses believed they saw and therefore deny the same.

5. Indiana's execution process is shrouded in secrecy. It is one of only two states with the death penalty that prohibits media witnesses of executions. *See* Whitney Downard, "*ICC, other news outlets file lawsuit to open executions to press*," INDIANA CAPITAL CHRONICAL, May 6, 2025, available at https://indianacapitalchronicle.com/2025/05/06/icc-other-news-outlets-file-lawsuit-to-open-executions-to-press/. The Associated Press, Indiana Capital Chronicle, Gannett Co., Inc., Circle City Broadcasting, LLC, and Tengna Inc., have filed a federal lawsuit alleging the bar against media witnesses is a violation of the First Amendment. *See* Southern District of Indiana Case No.

3

1:25-cv-00872-MPB-MJD, Dkt 9 (May 7, 2025).  The lawsuit challenging this outlier restriction on the First Amendment remains pending.

**ANSWER:** Defendants deny that Indiana's execution process is "shrouded in secrecy." Defendants further deny Indiana prohibits media witnesses of execution and thus has an "outlier restriction." Defendants admit the remaining allegations in Plaintiff's paragraph 5, and state that the district court denied the media plaintiffs' motion for a preliminary injunction.

6. The secrecy surrounding Indiana's execution process is furthered by the failure of the Indiana Department of Corrections ("IDOC") to timely and fully answer multiple public records requests [fn. 1 – The IDOC "answered" Ward's multiple public records requests on September 8, 2025, approximately four months after the first request, by providing several almost completely redacted documents revealing only the word "pentobarbital" and the amount paid for doses. It took IDOC approximately 120 days to disclose 25 pages of ridiculously redacted records.0] about the pentobarbital it has purchased and the source of the funds for such purchases even though the requests do not seek the identity of the pentobarbital supplier which is the only information shielded from disclosure under Indiana law.  IDOC's stonewalling follows its approaches in the past to hide from public view details about the lethal injection drugs it purchases.  *See e.g., Toomey v. Indiana Department of Corrections,* Marion County Circuit Court Cause No. 49C01-1501-PL-003142.

**ANSWER**: Defendants deny the allegations in Plaintiff's paragraph 6.

7. Witnesses to Indiana's two most recent executions, that of Joseph Corcoran and Ben Ritchie, report the witness room was shielded from any sound emanating from the execution chamber.  They could not hear the last words of Corcoran

4

or Ritchie, or any sounds that may have occurred during the executions. Preventing witnesses from hearing sounds from the execution chamber further obfuscates what transpires during executions from public view.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 7 of and therefore deny the same.

8. In addition to the execution chamber's sound isolation, it is also believed that the glass between the execution chamber and the witness room is glazed so the condemned inmate cannot see his witnesses from inside the chamber. In recent litigation before the Indiana Supreme Court, the Attorney General did not contest this fact. Thus, at the time of his execution, Indiana will deprive Ward from knowing whether his witnesses are in fact present for his execution and the comfort of seeing and engaging with his witnesses in his final moments.

**ANSWER:** Defendants admit that the condemned cannot see witnesses from the execution chamber. Defendants are without sufficient knowledge to admit or deny the remaining allegations in paragraph 8 and therefore deny the same.

9. It is in this context of unjustifiable secrecy by a state agency under a statutory obligation to make its actions known and in the context of a recent execution gone awry that Mr. Ward now asserts multiple violations of his civil rights by the IDOC.

**ANSWER:** Defendants deny the allegations contained in paragraph 9.

## II.    JURISDICTION

10. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343(a)(3) (original jurisdiction for matters seeking redress for deprivation of

any right secured by the Constitution), 2201(a) (declaratory relief) and 2202 (further relief), and under 42 U.S.C. § 1983(civil action for deprivation of rights).

**ANSWER:** Defendants admit the allegations contained in paragraph 10.

## III.  PARTIES

11. Plaintiff Roy Ward is an Indiana prisoner incarcerated under a sentence of death at the Indiana State Prison ("ISP"), 1 Park Row Street, Michigan City, Indiana.  His execution is scheduled for October 10, 2025, between midnight and sunrise.

    **ANSWER:** Defendants admit the allegations contained in paragraph 11.

12. Defendant Lloyd Arnold is the Commissioner of the IDOC, Indiana Government Center – South, 302 W. Washington Street, Indianapolis, Indiana. As Commissioner of the IDOC, he is responsible for the management of all Indiana correctional institutions including ISP.  He is sued in his official capacity.

    **ANSWER:** Defendants admit the allegations contained in paragraph 12.

13. Defendant Ron Neal is Warden at ISP, 1 Park Row Street, Michigan City, Indiana, and is responsible for executing Ward.  He is sued in his official capacity.

    **ANSWER:** Defendants admit that Warden Neal oversees executions as Warden at ISP, 1 Park Row Street, Michigan City, Indiana, and that he is sued in his official capacity. Defendants deny the remaining allegations in paragraph 13.

## IV.  VENUE

14. Defendant Lloyd Arnold is the Commissioner of the IDOC. The IDOC is headquartered in Indianapolis, Indiana, which lies in the United States District Court for the Southern District of Indiana. Upon information and belief, Defendant Arnold is a resident of the State of Indiana.

**ANSWER:** The case has been transferred to the Northern District of Indiana; therefore, the assertions have been rendered moot.

15. Defendant Ron Neal is employed by the IDOC and serves as the warden of Indiana State Prison ("ISP"), in Michigan City, Indiana. ISP is the location of the execution chamber and is the place where Ward's execution will occur unless the execution is stayed. ISP sits in the United States District Court for the Northern District of Indiana. Upon information and belief, Defendant Neal is a resident of the State of Indiana.

**ANSWER:** The case has been transferred to the Northern District of Indiana; therefore, the assertions have been rendered moot. To the extent a response is required, Defendants deny the allegations contained in paragraph 15.

16. Venue is proper in the Southern District of Indiana because it is the judicial district "in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Venue is also proper in the Northern District of Indiana because it is the judicial district in which Mr. Ward's execution will occur if not stayed by a court. 28 U.S.C. § 1391(b)(2). Venue is most proper, however, in the Southern District of Indiana because three related cases have been and are being litigated there. The first case was Mr. Ward's petition for habeas corpus relief under 28 U.S.C. § 2254 filed in the Southern District of Indiana (3:12-dv-00192-RLY-WGH). Ward's

habeas petition is a related case because it shares a strong factual connection and common parties with this case. The second case is Ward's second-in-time, claimed first habeas petition filed pursuant to 28 U.S.C. § 2254, a case filed contemporaneously with this case, with the same defendants as this case and similar claims. *Ward v. Neal*, Southern District of Indiana Case No. 1: 25-CV-01871-JRS- MG. The third case is the press lawsuit which is currently pending in the Southern District of Indiana (1:25-cv-00872-MPB-MJD). The defendants in this action, Arnold and Neal, are also defendants in the press lawsuit and when considering the defendant's motion to change venue to the Northern District of Indiana, the court found the defendants had "not shown that transferring this case to the Northern District of Indiana would be 'clearly more convenient.'" *See* Bookman order date May 14, 2025, 1:25-cv-00872-MPB-MJD, Dkt 32 (emphasis in order)(citing *Coffey v Van Dorn Iron Works*, 796 F.2d 217, 720(7th Cir. 1986)). This case is related to the press lawsuit not only because it has common defendants, but because it also has similar legal issues involving the failure of the IDOC to allow public access to information about the executions it carries out.

**ANSWER:** The case has been transferred to the Northern District of Indiana; therefore, the assertions have been rendered moot. To the extent a response is required, Defendants deny the allegations contained in paragraph 16.

## V.    PROCEDURAL HISTORY

17. On October 18, 2002, a Spencer County jury found Ward guilty of the July 11, 2001, murder and rape of Stacy Payne, and criminal deviant conduct. On

October 23, 2002, the jury recommended Ward be sentenced to death. Following the jury's recommendation, on December 18, 2002, the Honorable Wayne A. Roell sentenced Ward to death on the murder conviction. The Indiana Supreme Court reversed Ward's convictions and sentences on direct review, finding that Ward's constitutional right to a fair trial was violated when the trial court failed to grant Ward a change of venue. *Ward v. State* (*Ward I*), 810 N.E.2d 1042 (Ind. 2004).

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 17 and therefore deny.

18. On remand from the Indiana Supreme Court, Ward sought and obtained a new trial judge, the Honorable Robert J. Pigman. Judge Pigman granted Ward's request for a change of venue from Spencer County, and the parties agreed to select the jury from Clay County. The State proceeded on murder and rape charges, to which Ward pleaded guilty. After the penalty phase trial, the jury recommended a death sentence on the murder conviction, and on June 8, 2007, Judge Pigman sentenced Ward to death. The Indiana Supreme Court affirmed Ward's death sentence on April 7, 2009. *Ward v. State (Ward II)*, 903 N.E.2d (Ind. 2009), *aff'd on reh'g, Ward v. State (Ward III)*, 908 N.E.2d 595 (Ind. 2009), *cert. denied sub nom, Ward v. Indiana*, 559 U.S. 1038 (2010).

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 18 and therefore deny.

19. On January 15, 2010, Ward filed a state petition for post-conviction relief, which was amended on June 20 and July 28, 2010. After an evidentiary hearing, Judge Pigman denied the petition on November 10, 2010. Ward filed a Motion to Correct Errors which Judge Pigman denied on December 16, 2010. The Indiana Supreme Court affirmed the denial of post-conviction relief. *Ward v. State (Ward IV)*, 969 N.E.2d 46 (Ind. 2012), *reh'g denied* 2012 Ind. 2012 LEXIS 764 (Sept. 7, 2012).

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 19 and therefore deny.

20. On March 4, 2013, Ward filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Indiana. On September 22, 2015, the district court denied relief on all claims, but reserved ruling on a certificate of appealability. On October 19, 2015, Ward moved to alter and amend under FED. R. CIV. P. 59(e), which the district court denied on December 3, 2015. Along with his notice of appeal, Ward requested a certificate of appealability from the district court, which was denied *pro forma* on January 21, 2016, even though the warden did not file opposition to the request.

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 20 and therefore deny.

10

21. On February 2, 2016, the Seventh Circuit Court of Appeals granted, in part, the certificate of appealability as to ineffective assistance of counsel claims. Under the certificate of appealability, Ward filed an appeal on March 22, 2016. The Seventh Circuit affirmed the denial of federal habeas relief on August 18, 2016, and denied Ward's Petition for Rehearing and Rehearing En Banc on October 11, 2016. *Ward v. Neal*, 835 F.3d 698 (7th Cir. 2016), *reh'g and reh'g en banc denied* (Oct. 11, 2016). The Supreme Court denied Ward's petition for writ of certiorari on May 22, 2017. *Ward v. Neal*, 581 U.S. 995 (2017).

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 21 and therefore deny.

22. On December 22, 2015, Ward filed a complaint in the LaPorte Circuit Court against the commissioner of the IDOC and the warden alleging the IDOC's change to the lethal injection protocol, which substituted Brevital for Sodium Thiopental in the three-drug combination used for executions at the time, violated Ward's rights under the Indiana Administrative Rules and Procedures Act (ARPA) along with his due course and due process rights under the Indiana and United States constitutions. *Roy Ward v. Bruce Lemmon, Ron Neal*, Cause No. 46C01-1512-PL-2154. The circuit court granted the defendants' motion to dismiss under Indiana Trial Rule 12(B)(6) finding the defendants were not required to comply with the ARPA because a change to the lethal injection protocol is considered an internal policy and not rule promulgation. Ward appealed, and on June 1, 2017, the Indiana Court of Appeals reversed the

circuit court finding the IDOC must follow ARPA when promulgating rules and the IDOC's execution protocol constituted a rule. *Ward v. Carter*, 79 N.E.3d 383 (Ind. Ct. App. 2017). The defendants sought transfer to the Indiana Supreme Court under Indiana Appellate Rule 58(A) which was granted, and by operation of Rule 58(A), the Court of Appeals decision was automatically vacated. The Indiana Supreme Court affirmed the circuit court's decision. *Ward v. Carter*, 90 N.E.3d 660 (Ind. 2018).

**ANSWER:** To the extent this is a summary of the procedural history of Mr. Ward's APRA case, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 22 and therefore deny.

23. On June 27, 2025, the State of Indiana moved the Supreme Court of Indiana to set an execution date for Ward, and in response, Ward moved for a 30-day extension of time within which to file objections to setting an execution date. The Indiana Supreme Court granted Ward's motion and set July 30, 2025, as the deadline for filing objections but in the same order tentatively set Ward's execution to occur on October 10, 2025, before sunrise. On July 30, 2025, Ward filed his objection to setting an execution date and sought permission from the Indiana Supreme Court to file a successive petition for post-conviction relief based on newly-ripe claims challenging Indiana's Lethal Injection protocol. [fn. 2 – Ward could not have asserted state challenges to Indiana's lethal injection protocol at the time he filed his first state petition for post-conviction relief because no execution date had been set and the claims were not ripe. *Isom v. State*, 170 N.E. 623, 653 (Ind. 2021). Even though the first time Ward could

12

properly assert state challenges to Indiana's lethal injection protocol was after the Indiana Supreme Court set an execution date, any such challenge was considered successive under Indiana law simply because it occurred after the first petition was resolved. Thus, even though the lethal injection protocol challenge was properly a new claim, it was relegated to the status of a successive claim under Indiana law. As a consequence, Ward was forced to seek permission from the Indiana Supreme Court to file his newly-ripe claims in the fact-finding court of his conviction instead of being able to file his petition directly in the fact-finding court as he had done with his first post-conviction petition.] long with his request for permission to file a successive petition, Ward submitted a proposed successive petition. The Indiana Supreme Court denied Ward's motion for permission to file a successive post-conviction petition and set Ward's execution date for October 10, 2025, before the hour of sunrise. *Ward v. State*, 264 N.E. 637 (Ind. August 27, 2025).

**ANSWER:** To the extent this is a summary of Mr. Ward's criminal trial's procedural history, the case history speaks for itself. To the extent a response is required, Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 23 and therefore deny.

24.    On September 2, 2025, Ward filed a Motion for Rehearing requesting the Indiana Supreme Court reconsider its decision that lethal injection challenges are not permitted to be raised as a successive post-conviction petition. On September 10, 2025, the Court denied Ward's rehearing motion. *Ward v, State*, 2025 WL 2611301 (Ind. 2025).

**ANSWER:** The case law speaks for itself. To the extent a response is required,

Defendants are without sufficient information or knowledge to admit or deny the material allegations, if any, in paragraph 24 and therefore deny.

25. On September 15, 2025, Ward moved to intervene in the pending APRA suit related to IDOC lethal injection records. Upon information and belief, the Attorney General refused to consent to the motion to intervene.

**ANSWER:** Defendants admit that Ward moved to intervene in a pending APRA suit related to IDOC's lethal injection records. Defendants further admit that the IDOC, by counsel from the Office of Indiana Attorney General opposed the intervention. Defendants deny the remaining allegations in paragraph 25.

26. Just before the instant filing, Ward has filed a second-in-time, claimed first habeas corpus petition alleging an Eighth Amendment violation for IDOC's insistence to use a method of execution with knowledge that the most recent victim writhed in needless and unwarranted pain.

**ANSWER:** Defendants admit that Ward filed a second-in-time, claimed first habeas corpus petition alleging an Eighth Amendment violation over IDOC's method of execution. Defendants deny any remaining allegations in paragraph 26.

## VI. FACTUAL BACKGROUND

27. Plaintiff Ward incorporates by reference every statement and allegation set fourth throughout this Complaint as if rewritten here.

**ANSWER:** Defendants incorporate by reference their answers to rhetorical paragraphs 1 – 26 of Plaintiff's Complaint as if each were expressly set forth herein.

### A. Indiana's Execution Statute and Lethal-Injection Protocol

28. Indiana Code (IC) § 35-38-6-1 (2023) establishes Indiana's current method of execution.

**ANSWER:** Defendants admit that Ind. Code § 35-38-6, et seq. governs

14

Indiana's executions. The statute speaks for itself.

29. Execution is "inflicted by intravenous injection of a lethal substance or substances into the convicted person" in a "quantity sufficient to cause the death of the convicted person" and "until the convicted person is dead." IC § 35-38-6-1(a).

**ANSWER:** The statute speaks for itself. To the extent Plaintiff's paragraph 29 contains an allegation, Defendants admit the statute states as written in paragraph 29.

30. The IDOC may adopt rules under Indiana's Administrative Rules and Procedures Act (ARPA), IC § 4-22-2, necessary to implement the method of execution. IC § 35-38-6-1(d).

**ANSWER:** The statutes speak for themselves.

31. IDOC's lethal injection rules are not "rules" under the ARPA and Indiana's lethal injection protocol is therefore exempt from ARPA's rulemaking strictures including public notice and comment. *Ward v. Carter*, 90 N.E.3d 660, 666 (Ind. 2018).

**ANSWER:** The case law speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 31.

32. IDOC's lethal injection protocol includes two possible methods of execution labeled "Method 1" and "Method 2." *See* Lethal Injection Protocol, Exhibit P1 at 13 - 16.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 32.

### l). Lethal Injection Protocol "Method 1"

15

33. 'Method 1 is a three-drug lethal injection protocol. Exhibit P1 at 15.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 33.

34. The first drug injected in Method 1 is Sodium Pentothal, Pentobarbital or Brevital.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 34.

35. The second drug injected in Method 1 is Pancuronium Bromide or Vecuronium.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 35.

36. The third drug injected in Method 1 is Potassium Chloride.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 36.

37. Under Method 1, the first injection is Sodium Pentothal, Pentobarbital or Brevital followed by saline solution.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 37.

38. The first injection is meant to render the person unconscious.

  **ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 38.

39. The depth of unconsciousness is determined through the use of "ammonia inhalant, pin prick or other accepted stimuli."

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 39.

40. Under Method 1, the second injection is Pancuronium Bromide or Vecuronium Bromide followed by saline solution.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 40.

41. Pancuronium Bromide and Vecuronium Bromide are neuromuscular blocking agents meant to paralyze muscles including those used for breathing.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 41 and therefore deny the same.

42. The third injection is administered only after the warden gives approval.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. Per the Lethal Injection Protocol, "The Warden signals approval to proceed." Defendants deny the remaining allegations contained in paragraph 42.

43. The third injection is Potassium Chloride.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 43.

44. Potassium Chloride acts to stop the heart by interfering with electric signals that regulate heart function.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 44 and therefore deny the same.

45. Potassium Chloride leads to cardiac arrest.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 45 and therefore deny the same.

17

## 2). Lethal Injection Protocol "Method 2"

46. Method 2 is a one-drug lethal injection protocol. Exhibit P1 at 15.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 46.

47. Method 2 involves injecting pentobarbital in a dose high enough to inflict death.

**ANSWER:** IDOC's Lethal Injection Protocol, Exhibit P1, speaks for itself. To the extent a response is required, Defendants admit the allegations contained in paragraph 47.

48. Pentobarbital is a central nervous system depressant which in high doses can cause unconsciousness and respiratory arrest.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 48 and therefore deny the same.

49. Pentobarbital is a short-acting barbiturate.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 49 and therefore deny the same.

## 3). IDOC is likely now using Method 2

50. IDOC has not publicly disclosed whether Method 1 or Method 2 was used to execute Joseph Corcoran and Benjamin Ritchie.

**ANSWER:** Defendants admit that Method 2 was used to execute Joseph Corcoran and Benjamin Ritchie.

51. Toxicology examinations performed on Corcoran and Ritchie revealed high levels of pentobarbital in their blood without the presence of drugs used in

Method 1. *See* Serum Toxicology Results for Benjamin Ritchie, Exhibit P2 at 1; and Serum Toxicology Results for Joseph Corcoran, Exhibit P3 at 1.

**ANSWER:** Defendants admit the allegations contained in paragraph 51. The Toxicology Results, Exhibits P2 and P3, speak for themselves.

52. Based on these toxicology reports and very recent public records responses with only the word "pentobarbital" unredacted, it appears IDOC used Method 2 to executed Corcoran and Ritchie. However, IDOC and the entire state apparatus have not officially confirmed this to be true.

**ANSWER:** Defendants admit Method 2 was used to execute Corcoran and Ritchie. Defendants deny the remaining allegations contained in paragraph 52.

### B.  Indiana exempts lethal injection drug suppliers from its own professional oversight and licensing standards.

53. To procure lethal injection substance, IDOC "may make and enter into a contract with an outsourcing facility, a wholesale drug distributor, a pharmacy or a pharmacist." IC § 35-38-6-1(e).

**ANSWER:** Defendants admit that Ind. Code § 35-38-6-1(e) states what Plaintiff alleges. The statute speaks for itself. Defendants deny any remaining allegations contained in paragraph 53.

54. In Indiana, the issuance or compounding of the lethal chemical used in executions substance does not constitute the practice of pharmacy. IC § 35-38-6-1(e)(1).

**ANSWER:** Defendants admit that Ind. Code § 35-38-6-1(e)(1) states what Plaintiff alleges. The statute speaks for itself. Defendants deny any remaining allegations contained in paragraph 54.

55. The supplier of lethal substances "is not subject to the jurisdiction of the

Indiana board of pharmacy, the medical licensing board of Indiana, the Indiana department of health, or the Indiana professional licensing agency" and is not subject to Indiana law covering the regulation and licensing of professions and occupations. IC § 35-38-6-1(e)(2) and (3).

**ANSWER:** Defendants admit that Ind. Code § 35-38-6-1(e)(2) and (3) state what Plaintiff alleges. The statutes speak for themselves. Defendants deny any remaining allegations contained in paragraph 55.

### C. Under Indiana law, *only* information related to *supplier identity* is confidential.

56. In addition to providing no professional or regulatory oversite of its supplier of lethal chemicals, Indiana requires the identity of the supplier to remain confidential and prohibits disclosure of the supplier's identity through discovery or as part of evidence introduced in a civil or criminal case. IC § 35-38-6-1(f)(1)-(3).

**ANSWER:** Defendants admit that Ind. Code § 35-38-6-1(f)(1)-(3) requires the identity of the supplier to remain confidential and prohibits disclosure of the supplier's identity through discovery or as evidence in any civil or criminal proceeding. The statute speaks for itself. Defendants deny any remaining allegations contained in paragraph 56.

57. In addition, information "reasonably calculated" to lead to the identity of the supplier including a name, residential or business address, residential or office telephone number and Social Security or tax identification number is confidential. IC § 35-38-6-1(f)(4).

**ANSWER:** Defendants admit that Ind. Code § 35-38-6-1(f)) states what Plaintiff alleges. The statute speaks for itself. Defendants deny any remaining allegations contained in paragraph 57.

### D. Federal Drug Laws

#### 1) The Food, Drug and Cosmetics Act (FDCA)

58. Drugs are regulated by the Food, Drug, and Cosmetics Act (FDCA), and related

    regulations.

    **ANSWER:** Plaintiff's allegation is vague, but Defendants generally admit the allegations contained in paragraph 58.

59. The FDCA is enforced by the Food and Drug Administration (FDA).

    **ANSWER:** Defendants admit the allegations contained in paragraph 59.

60. Pharmaceutical drugs are manufactured or compounded.

    **ANSWER:** Defendants generally admit that pharmaceutical drugs can be manufactured or compounded. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 60 and therefore deny same.

61. Pharmaceutical manufacturing refers to the industrial scale process of

    producing therapeutic drugs.

    **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 61 and therefore deny same.

62. Pharmaceutical manufacturing is regulated by the FDA and only FDA-

    approved medications are manufactured in the United States.

    **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 62 and therefore deny same.

63. Pharmaceutical manufacturers must adhere to strict current Good

    Manufacturing Practices ("cGMP") to ensure product safety and efficacy and

    must also comply with FDA reporting and inspection rules.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 63 and therefore deny same.

64. The FDA requires establishments that manufacture, prepare, propagate, compound or process drugs distributed in the United States to register with the FDA. Registration is also required for establishments offering drugs for import to the United States.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 64 and therefore deny same.

65. The FDA requires registered drug establishments to provide it with current lists of all drugs the establishment produces for commercial distribution. Each drug produced is identified by a unique number called the National Drug Code (NDC).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 65 and therefore deny same.

66. Current Good Manufacturing Practices ("cGMPs") are a set of FDA regulations to ensure the quality, safety and efficacy of the products from various industries including the pharmaceutical industry. The regulations aim to prevent harm to consumers by ensuring products are consistently manufactured to meet standards for identity, strength, purity and quality. *See* Expert Affidavit of Michaela Almgren, Exhibit P4 at 3 -4.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 66 and therefore deny same.

67. Pharmaceutical compounding is a practice in which a licensed pharmacist, a

licensed physician or an outsourcing facility combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient or, in the case of an outsourcing facility, to produce large batches of drugs for medical office use or to address a drug shortage. *Id.* at 2.

**ANSWER:** Defendants admit that this is the general definition of "drug compounding." Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 67 and therefore deny same.

68. Compounding pharmacies are either 503A or 503B pharmacies under the FDCA. *Id.* at 4 – 5.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 68 and therefore deny same.

69. Section 503A of the FDCA outlines conditions under which drug compounding by a licensed pharmacist is exempt from certain FDA requirements. *Id.* at 4.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 69 and therefore deny same.

70. A 503A compounding pharmacy may compound a drug only after receiving, or reasonably anticipating, a valid prescription for an individual patient. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 70 and therefore deny same.

71. 503A pharmacies are generally overseen by state boards of pharmacy and/or health departments rather than the FDA. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 71 and therefore deny same.

72. 503A compounding pharmacies are generally exempt from routine FDA inspection. *Id.*

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 72 and therefore deny same.

73. 503A compounding facilities are exempt from following cGMPs. *Id.*

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 73 and therefore deny same.

74. A 503B compounding facility (or outsourcing facility) is a facility that manufactures and distributes sterile compounded medications directly to healthcare providers in response to clinical demand. *Id.* at 5.

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 74 and therefore deny same.

75. 503B compounding facilities also produce drugs listed on the official FDA Drug Shortage List. *Id.*

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 75 and therefore deny same.

76. Unlike 503A compounding pharmacies, 503B facilities must comply with cGMPs. *Id.*

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 76 and therefore deny same.

77. 503B compounding facilities are subject to regular FDA inspections and specific adverse event reporting requirements. *Id.*

   **ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 77 and therefore deny same.

78. Compounded drugs are not FDA approved which means the agency does not verify their safety, effectiveness or quality before they are marketed. *Id.* at 2.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 78 and therefore deny same.

79. United State Pharmacopeia (USP) Compendium is an authoritative collection of public standards published by the USP for the identity, strength, quality, purity, packaging, labeling, and storage of drugs, excipients, and compounded preparations. It includes monographs for drug substances, drug products, excipients, and compounded preparations. The compendium also provides general chapters describing procedures, tests and quality standards, such as chapter 797 for sterile compounding and chapter 800 for handling of hazardous drugs. *Id.* at 4.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 79 and therefore deny same.

80. Parenteral drug compounding is the process of preparing sterile medications for intravenous or other non-oral administration routes. This process is meant to be governed by strict quality and sterility requirements because parenteral products bypass natural protective barriers making contamination risks particularly dangerous. *Id.* at 2 − 3.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 80 and therefore deny same.

81. Pentobarbital compounded for use in lethal injection executions involves parenteral compounding because powdered pentobarbital must be dissolved in solution to be injectable. *Id.* at 15.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 81 and therefore deny same.

82. For sterile manufacturing, cGMPs requires highly controlled cleanroom environments, validated aseptic processes, sterilization of equipment and components, strict personnel training and gowning, and comprehensive quality systems with testing for sterility, endotoxins, and particulates before product release. *Id.* at 3 -4.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 82 and therefore deny same.

83. The cGMPs are legally binding requirements on drug manufacturers and 503B outsourcing pharmacies producing sterile pharmaceuticals. *Id.* at 5.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 83 and therefore deny same.

84. The cGMPs governing the production of sterile pharmaceuticals are designed to prevent contamination and ensure patient safety. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 84 and therefore deny same.

85. Sterile drug compounding by a 503A pharmacy is not subject to cGMPs. *Id.* at 4.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 85 and therefore deny same.

86. USP Chapter 797 is a federally recognized standard that establishes the requirements for compounding sterile preparations to protect patients from harm caused by microbial contamination, excessive bacterial endotoxins, variability in intended strength, and the use of inappropriate ingredients. It regulates how pharmacies, hospitals and other facilities prepare sterile drugs, covering areas such as personnel training, environmental controls, aseptic technique, documentation and assignment of beyond-use dates ("BUDs"). *Id.* at 3 – 4.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 86 and therefore deny same.

87. USP Chapter 797 serves as the key guideline for 503A traditional pharmacy compounding, where cGMP requirements do not apply. The goal of USP Chapter 797 is to ensure that compounded sterile products ("CSPs") are prepared under conditions that maintain sterility and quality, thereby reducing the risk of infections, medication errors, and compromised patient safety. *Id.* at 3.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 87 and therefore deny same.

88. Because the FDA does not inspect 503A compounding pharmacies, state boards of pharmacy are responsible for ensuring compliance with USP Chapter 797 guidelines for sterile compounding. *Id.* at 4 -5.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 88 and therefore deny same.

89. Indiana exempts its sterile lethal injection substance supplier from oversight by the State Board of Pharmacy and Department of Health. *Id*. at 13-14.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 89 and therefore deny same.

90. To summarize, Indiana allows execution drugs to be prepared in secret with absolutely no oversight.

**ANSWER:** Defendants deny the allegations contained in paragraph 90.

## 2) **The Controlled Substances Act**

91. The Controlled Substances Act (CSA) regulates the manufacture, importation, possession, use and distribution of scheduled controlled substances.

**ANSWER:** Defendants admit that this is generally what the CSA regulates. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 91 and therefore deny same.

92. Under the CSA, drugs, substances and chemicals used to make drugs are classified into five categories depending upon the drug's acceptable medical use and the drug's abuse or dependency potential. These categories are called "schedules."

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 92 and therefore deny same.

93. Schedule II drugs are considered dangerous.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 93 and therefore deny

same.

94. Pentobarbital is a Schedule II drug under the CSA.

**ANSWER:** Defendants admit that pentobarbital is a Schedule II substance under the CSA. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 94 and therefore deny same.

95. If a drug is classified as a controlled substance under the CSA, the drug is also

regulated by the Drug Enforcement Agency ("DEA").

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 95 and therefore deny same.

96. Because pentobarbital is a Schedule II substance, it is regulated by the DEA.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 96 and therefore deny same.

97. If a drug is a controlled substance, as pentobarbital is, individuals who handle

it must have a registration number from the DEA.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 97 and therefore deny same.

98. Because IDOC is procuring and handling injectable pentobarbital, it must have

a registration number from the DEA.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 98 and therefore deny same.

99. Completion of DEA Form 222 is required to sell or transfer Schedule I or II

controlled substances.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 99 and therefore deny

same.

100.    Because pentobarbital is a Schedule II drug, completion of DEA Form 222

is required to sell or transfer pentobarbital.

**ANSWER:** Defendants are without sufficient information or knowledge to
admit or deny the allegations contained in paragraph 100 and therefore deny
same.

101.    Purchasers of controlled substances must complete DEA Form 222 to

procure the controlled substance. 21 C.F.R. § 1305.12 (a) (2025).

**ANSWER:** The federal regulation speaks for itself. Defendants are without
sufficient information or knowledge to admit or deny any other allegations
contained in paragraph 101 and therefore deny same.

102.    Because IDOC is a purchaser of pentobarbital, it must complete DEA Form

222 to purchase pentobarbital.

**ANSWER:** Defendants admit it must complete a DEA Form 222. Defendants
are without sufficient information or knowledge to admit or deny the
remaining allegations contained in paragraph 102 and therefore deny same.

103.    A purchaser of a controlled substance must make a copy of the original DEA

Form 222 for its records and submit the original to its supplier. 21 C.F.R. §

1305.13(a) (2025).

**ANSWER:** The federal regulation speaks for itself. Defendants are without
sufficient information or knowledge to admit or deny any othe allegations
contained in paragraph 103 and therefore deny same.

104.    Because IDOC is a purchaser of pentobarbital, it must retain a copy of DEA

Form 222 for its records.

**ANSWER:** Defendants admit it retains a copy of DEA Form 222. Defendants
are without sufficient information or knowledge to admit or deny the
remaining allegations contained in paragraph 104 and therefore deny same.

105.    Completion of DEA Form 41 is required if a DEA registrant destroys a

controlled substance.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 105 and therefore deny same.

106.    Because pentobarbital is a controlled substance, completion of DEA 41 is required if a DEA registrant destroys pentobarbital.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 106 and therefore deny same.

107.    Indiana procured injectable pentobarbital for use in the executions of Joseph Corcoran and Benjamin Ritchie.

**ANSWER:** Defendants admit the allegations contained in paragraph 107.

108.    Because IDOC procured injectable pentobarbital for use in the Corcoran and Ritchie executions, it must have retained copies of DEA Form 222 for its records.

**ANSWER:** Defendants admit it has copies of DEA Form 222. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 108 and therefore deny same.

109.    Because IDOC possessed expired injectable pentobarbital, it must have documented the destruction of the expired doses using DEA Form 41.

**ANSWER:** Defendants admit they have destroyed expired doses of pentobarbital. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations contained in paragraph 109 and therefore deny same.

   E. **Indiana has not disclosed whether it procures manufactured or compounded injectable pentobarbital.**

110.    It is unknown whether IDOC procures manufactured or compounded

injectable pentobarbital for executions.

**ANSWER:** Defendants states that IDOC procures manufactured injectable pentobarbital for executions.

111.  If IDOC purchases compounded injectable pentobarbital, it is unknown whether it purchases the substance from a 503A or 503B compounding pharmacy or outsourcing facility.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 111 and therefore deny same.

### 1). If IDOC is purchasing manufactured injectable pentobarbital (Nembutal), it is making such purchases clandestinely.

112.  The "Red Book" is the Micomedex RED BOOK database, a resource that provides comprehensive drug product and pricing information, including manufacturer details. Exhibit 4 at 8.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 112 and therefore deny same.

113.  The "Orange Book" is an FDA publication officially titled "Approved Drug Products with Therapeutic Equivalences Evaluations," and is a list of drugs approved by the FDA as safe and effective. For generic drug manufacturers, the Orange Book is used to identify generic drug equivalents of brand-name drugs and patient information which dictates when a generic drug can enter the market. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 113 and therefore deny same.

114.    Pharmaceutical manufacturers and outsourcing pharmacies object to the use of their products to carry out executions. Manufacturers take steps to block the sale of their products to correctional facilities and require purchasers to sign written agreements not to resale pentobarbital to prison facilities. *See* https://lethalinjectioninfo.org/industry-statements/ (Akorn, Fresenius Kabi, Fresenius Kabi Compounding, LLC, Hikma., Lundbeck, and Sagent among many others).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 114 and therefore deny same.

115.    Sagent Pharmaceuticals, a Red Book listed manufacturer of "Nembutal," the brand name of pentobarbital, does not accept orders from correctional facilities and prison systems to prevent its products from being used in lethal injection executions, and requires its distributors and wholesalers to make written commitments not to sell or distribute Sagent products to prison facilities. *See* Statement of Sagent Pharmaceuticals, Exhibit P5; *See also* Statement of Akorn, Inc., Exhibit P6.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 115 and therefore deny same.

116.    Hikma, another manufacturer of pentobarbital, also objects to the use of its products in executions. Exhibit P4 at 23.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 116 and therefore deny same.

33

117.    In 2011, Lundbeck blocked the sale of its Nembutal to departments of corrections and required purchasers to sign a written agreement that they will not redistribute the drug.  *See* D. Jolly, "*Danish Company Blocks Sale of Drug for U.S. Executions*," NEW YORK TIMES (July 1, 2011) available at https://www.nytimes.com/2011/07/02/world/europe/02execute.html .

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 117 and therefore deny same.

118.    If IDOC is procuring injectable pentobarbital from a manufactured source, it is doing so clandestinely from a party other than the manufacturer and the clandestine supplier is likely violating a written agreement not to resale Nembutal to prisons.

**ANSWER:** Defendants deny the allegations contained in paragraph 118.

119.    The purchase of manufactured Nembutal from a source acting in contravention of the promise not to resale the drug to prisons raises fair inferences that such a source is ignoring other rules, such as proper transportation and storage rules.

**ANSWER:** Defendants deny the allegations contained in paragraph 119.

### 2). IDOC is likely using compounded injectable pentobarbital to carry out executions because recent purchases have expired before they could be used.

120.    Compounding involves the use of raw ingredients, including Active Pharmaceutical Ingredients ("APIs"), which are the component of a drug that produces its intended therapeutic effect.  Almgren Affidavit, Exhibit P4 at 4.

34

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 120 and therefore deny same.

121.    In compounded pentobarbital solution, pentobarbital sodium powder is the API. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 121 and therefore deny same.

122.    There are significant questions about the quality of APIs used in compounding.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 122 and therefore deny same.

123.    Many APIs come from plants in India and China that are not registered with the FDA.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 123 and therefore deny same.

124.    It is difficult to trace the raw chemicals back to the original manufacturer for information about their quality and integrity.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 124 and therefore deny same.

125.    It is also difficult to determine expiration dates of individual ingredients.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 125 and therefore deny same.

126.    A chemical labeled as a particular active ingredient may actually be a different ingredient, and there is no way to have confidence that the APIs are

35

not contaminated.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 126 and therefore deny same.

127.    Compounded drugs degrade quickly.  Exhibit P4 at 17 -20.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 127 and therefore deny same.

128.    Compounded drugs lose efficacy more quickly than manufactured drugs.

*Id.* at 9.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 128 and therefore deny same.

129.    Compounded drugs are not required to meet the stringent requirements

regarding contamination, dilution and degradation that manufactured drugs

must meet. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 129 and therefore deny same.

130.    Compounding unnecessarily adds risk that the drug will be ineffective,

sub-potent, expired or contaminated, or that they will contain unintended

additives. *Id.* at 21.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 130 and therefore deny same.

131.    Manufactured Nembutal is available as an API in powder form or as a

sterile solution for intravenous injection, containing 50 mg of pentobarbital

sodium per mL. *Id.* at 9.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 131 and therefore deny same.

132.    Manufactured pentobarbital in sterile solution has a typical shelf-life of two to three years before it expires. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 132 and therefore deny same.

133.    Compounded injectable pentobarbital has typically a shorter shelf-life because compounded drugs do not have long-term stability. *Id.* at 9 - 10.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 133 and therefore deny same.

134.    While commercially manufactured products are produced in highly controlled environments under cGMP requirements, compounding pharmacies, even when following USP Chapter 797, generally operate in less stringent conditions that large-scale manufacturing facilities increasing the risk of contamination. *Id.* at 9.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 134 and therefore deny same.

135.    Furthermore, compounding processes often involve open handling, which increases exposure to light, heat, air or moisture – factors that accelerate degradation. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 135 and therefore deny same.

136.    A beyond-use date ("BUD") is the date after which a compounded drug

preparation should not be used, stored, or transported. A BUD is assigned to compounded medications to indicate when the drug may no longer be safe or effective due to factors such as chemical or physical degradation or microbial contamination. *Id.* at 6.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 136 and therefore deny same.

137.    According to USP Chapter 797, the BUD for sterile compounding, the type required to compound injectable pentobarbital, varies by facility type and environmental controls and can range from as short as 12 hours in less controlled settings to several days or months in facilities with more stringent environmental standards. *Id.* at 18.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 137 and therefore deny same.

138.    Compounded drugs have shorter BUDs because they lack rigorous stability testing, sterile manufacturing controls, and validated expiration dating of APIs. *Id.* at 10.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 138 and therefore deny same.

139.    Recently, Indiana Governor Mike Braun told members of the media that two doses of its lethal injection chemical expired before they could be used which necessitated the purchase of additional doses. Given Indiana just resumed executions in December of 2024 after a long break from executions, it is most likely Indiana is purchasing compounded injectable pentobarbital to

38

carry out executions because manufactured doses would not have expired before they could be used. [fn. 3 – This is a logical inference but it also possible that IDOC is procuring manufactured doses from a clandestine source unloading their supply of injectable Nembutal just before it expires.]

**ANSWER:** Defendants deny purchasing compounded injectable pentobarbital. Defendants purchased manufactured injectable pentobarbital. Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 139 and therefore deny same.

140.  If IDOC is purchasing compounded injectable pentobarbital, it is likely purchasing it from a 503A compounding facility because 503B facilities typically focus on large-batch production of drugs in shortage or high clinical demand, and pentobarbital is neither on the FDA Drug Shortage List nor in clinical demand making it less likely a 503B outsourcing facility would be the source of supply of injectable pentobarbital. *Id.* at 10.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 140 and therefore deny same.

### 3). <u>If IDOC is purchasing injectable pentobarbital from a 503A compounding pharmacy, it is obtaining it from a source not verified by the FDA and unaccountable to the Indiana Board of Pharmacy or Department of Health.</u>

141.  503A compounding pharmacies are exempt from routine FDA oversight because they compound patient-specific prescriptions under state regulation and do not engage in large-scale manufacturing. *Id.* at 4-5, 10.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 141 and therefore deny same.

142.  503A compounding pharmacies are not required to follow cGMPs but are

required to follow USP standards. *Id*. at 4-5.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 142 and therefore deny same.

143.    The FDA generally defers to state authorities for enforcing compliance with USP standards for patient-specific compounding activities. *Id*. at 11.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 143 and therefore deny same.

144.    Indiana exempts its supplier of injectable pentobarbital from state oversights by the Board of Pharmacy and Department of Health. *Id*. at 13-14.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 144 and therefore deny same.

145.    If IDOC obtains injectable pentobarbital from an unknown 503A compounding pharmacy, it is also unknown if the pharmacy is operating in compliance with USP guidelines because there is no way to research compliance records. This raises concerns that the 503A facility may not meet the rigorous USP Chapter 797 requirements for sterile compounding necessary to create injectable pentobarbital. *Id*. at 11.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 145 and therefore deny same.

146.    USP Chapter 797 includes requirements for proper environmental controls, personnel training, equipment maintenance, sterility testing, and quality assurance procedures. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 146 and therefore deny same.

147.    State Boards of Pharmacy are responsible for conducting regular audits of pharmacies to verify compliance with laws and regulations. *Id*.

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 147 and therefore deny same.

148.    Indiana exempts its injectable pentobarbital supplier from oversight from the State Board of Pharmacy. *Id*. at 13-14.

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 148 and therefore deny same.

149.    Without oversight, an expired or contaminated API could be used to compound injectable pentobarbital or it could be compounded in non- sterile conditions making it more likely its use will cause unnecessary pain and suffering. *Id*. at 14.

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 149 and therefore deny same.

150.    Without oversight, there is concern that compounded injectable pentobarbital may be prepared by an individual who is neither qualified nor appropriately trained, and who may not even be a licensed pharmacist. *Id*. at 13-14.

   **ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 150 and therefore deny same.

151.    If an unqualified person compounds drugs, the risk of medication errors and

contamination is significantly higher because an unqualified person lacks the technical knowledge to ensure correct drug dosage, sterile technique and proper handling all of which leads to variations in potency, degradation and microbial contamination. Such results can result in ineffective and harmful medications. *Id.* at 14.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 151 and therefore deny same.

152.    Furthermore, the drugs may be compounded in a facility not intended for the preparation of human drug products. Compounding drugs in an unregulated space can severely compromise their quality and safety. Such environments lack proper sterile conditions, controlled temperature and humidity, and validated equipment, all of which are essential to maintaining drug stability and potency. *Id.* at 14-15.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 152 and therefore deny same.

153.    Additionally, drugs compounded in a non-complying environment are at higher risk for contamination with bacteria, fungi or particulate matter. *Id.* at 14.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 153 and therefore deny same.

154.    Compounded pentobarbital contaminated with bacteria, fungi or particulate matter will result in severe pain upon injection.

**ANSWER:** Defendants are without sufficient information or knowledge to

42

admit or deny the allegations contained in paragraph 154 and therefore deny same.

155.    Indiana's State Board of Pharmacy has filed administrative complaints against compounding pharmacies for unsanitary practices.  Pharmacies can and do violate regulations, resulting in compounded medications that do not meet safety and quality standards.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 155 and therefore deny same.

156.    Without oversight, the potency and quality of compounded medications are inherently uncertain.  Lack of oversight creates significant risks as recipients may be exposed to ineffective or harmful substances causing unnecessary pain and suffering. *Id*. at 14-15.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 156 and therefore deny same.

### 4).  If IDOC is purchasing injectable pentobarbital from a 503A compounder, the compounder is supplying the drug without a valid prescription in violation of federal law.

157.    Under the CSA, it is unlawful to dispense any controlled substance except pursuant to a valid prescription issued for a legitimate medical purpose by a registered practitioner acting in the course of professional practice.  21 U.S.C. §§ 802(21), 802(27), 829(e)(2), 841(a)(1).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 157 and therefore deny same.

158.    No drug which is both a Schedule II controlled substance under the CSA

and a prescription drug under the FDCA may be dispensed without a written prescription from a medical practitioner except in emergency situations where the drug may be dispensed upon an oral prescription as long as the oral prescription is eventually reduced to writing. 21 U.S.C. § 829(a).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 158 and therefore deny same.

159.    Pentobarbital is both a scheduled controlled substance under the CSA and a prescription drug under the FDCA.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 159 and therefore deny same.

160.    The term "dispense" means to deliver a controlled substance to an ultimate user by a practitioner including the prescribing and administering of a controlled substance. 21 U.S.C. § 802(10).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 160 and therefore deny same.

161.    The CSA thus requires a written prescription of a medical practitioner in order to lawfully dispense and administer pentobarbital.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 161 and therefore deny same.

162.    Further, under Section 503A of the FDCA, a pharmacy may only compound a drug after receiving a valid prescription for an individual patient, or if a prescription is reasonably anticipated. Almgren Affidavit, Exhibit P4 at 22.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 162 and therefore deny same.

163.    Compounding a drug without a prescription or a reasonably anticipated prescription is a violation of federal law. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 163 and therefore deny same.

164.    Pharmacies that fail to adhere to these requirements are operating outside the scope of 503A regulations which would ordinarily subject then to enforcement actions by state boards of pharmacy or other regulatory authorities. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 164 and therefore deny same.

165.    Indiana law exempts such a 503A pharmacy from enforcement actions by the Board of Pharmacy or Department of Health. *Id*. at 13-14.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 165 and therefore deny same.

### 5). <u>Compounding injectable pentobarbital is a complex process requiring proper training, education and access to specialized equipment raising quality concerns from sourcing compounded injectable pentobarbital from an unregulated source</u>.

166.    Preparation of drugs intended for intravenous ("IV") administration is one of the most difficult of all pharmaceutical processes to execute. *Id*. at 15-17

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 166 and therefore deny same.

167.    For an IV drug to be compounded effectively, the process must be carried

out under specific environmental conditions, using precise equipment, and

performed by highly trained personnel. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 167 and therefore deny same.

168.    A delicate balance of chemicals is required for the API pentobarbital sodium

powder to remain in an injectable solution at the correct pH and without

suspension particles. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 168 and therefore deny same.

169.    There is more than one "recipe" to produce compounded injectable

pentobarbital, but all recipes require mixture of several chemicals to

maintain the delicate balance. *Id*. at 15.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 169 and therefore deny same.

170.    Manufactured Nembutal (injectable pentobarbital) is prepared as a mixture

containing pentobarbital sodium powder, propylene glycol 40% v/v, and alcohol

10%. Additional ingredients such as sodium hydroxide and hydrochloric acid

may be used to stabilize the solution to produce the final pH of 9.5. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 170 and therefore deny same.

171.    Compounded injectable pentobarbital can be made by adding water to the

API pentobarbital sodium powder along with sodium hydroxide pellets to bring

the pH to 12. Hydrochloric acid is added to the solution to bring the pH back down to around 9.8, a point at which the powdered pentobarbital sodium just barely remains in solution. Then propylene glycol is added (40% v/v) as is alcohol. The solution is filtered using a .22 micron filter to assure sterility. *Id.* at 15 – 16.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 171 and therefore deny same.

172.    Filter integrity is key to a proper compounding process. To assure filter integrity a quality assurance report should be issued documenting the filter has undergone and passed pressure testing. *Id.* at 16.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 172 and therefore deny same.

173.    Any changes in pH can cause the pentobarbital powder to precipitate out of solution, can cause the formation of a suspension and can change in the potency of the drug solution. *Id.* at 16.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 173 and therefore deny same.

174.    If the final compounded product's pH is incorrect, upon injection the solution can cause severe pain and suffering because the body's tissues are sensitive to acidity and alkalinity. Deviations in pH cause burning, stinging and tissue injury upon injection. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 174 and therefore deny same.

175.   If a precipitate or suspension forms, the pentobarbital cannot be safely injected because it will cause pain and suffering due to the presence of particulate matter.  Injection of a solution containing particles may lead to tissue injury and occlusion of the vasculature which can result in an extremely painful thromboembolism.  *Id.* at 16 – 17.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 175 and therefore deny same.

176.   If a precipitate forms, the potency of the injection will be lower leading to a slow and excruciatingly painful death.  *Id.* at 16.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 176 and therefore deny same.

177.   Subpotent pentobarbital containing particulate matter can produce unpredictable pharmacokinetic and pharmacodynamic effects causing a prolonged death where the prisoner experiences suffocation, drowning or other severe respiratory distress.  *Id.* at 16-17. Upon information and belief, this apparently occurred in a recent Tennessee execution.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 177 and therefore deny same.

178.   The compounding environment is also key to the proper compounding process. *Id.* at 17 – 20.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 178 and therefore deny same.

179.   Environmental control of the compounding area including air quality,

surface sanitization, and personnel practices directly influence the sterility and stability of compounded drugs. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 179 and therefore deny same.

180.    BUDs of the final product must be assigned based not only on the drug's chemical characteristics but also on the risk level associated with the compounding with stricter controls enabling longer BUDs and higher-risk or less controlled environments requiring shorter BUDs to ensure patient safety. *Id.* at 17 -18.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 180 and therefore deny same.

181.    The BUD must be strictly observed in sterile compounding because it defines the time period during which a preparation is expected to remain sterile, chemically stable, and therapeutically effective under specified storage conditions. *Id.* at 20.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 181 and therefore deny same.

182.    BUDs must be supported by stability studies to provide scientific evidence that the drug maintains its intended strength, purity and sterility for the assigned duration. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 182 and therefore deny same.

183.    If the preparation is created from non-sterile ingredients, or at a facility or

by an individual who lacks the expertise to maintain sterility and quality of the drug, the drug can become contaminated with fungi, bacteria and other contaminants.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 183 and therefore deny same.

184.    Contaminants include endotoxins, which would elicit an inflammatory reaction and can result in shock upon administration.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 184 and therefore deny same.

185.    Air contamination may cause an allergy-causing agent to be produced.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 185 and therefore deny same.

186.    The consequences of contamination can be immediate anaphylaxis which is a life-threatening allergic reaction.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 186 and therefore deny same.

187.    These various problems with compounded drugs create a substantial risk of serious pain.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 187 and therefore deny same.

188.    Sterile compounded drugs must be stored within specific temperature requirements. *Id*. at 21-22

**ANSWER:** Defendants are without sufficient information or knowledge to

50

admit or deny the allegations contained in paragraph 188 and therefore deny same.

189.    If temperature requirements are not followed, there is an increased risk of microbial growth, chemical degradation and contamination. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 189 and therefore deny same.

190.    Compounded drug stability depends on the purity and concentration of the ingredients, packaging and environmental exposure, and storage, especially for compounded drugs in solution. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 190 and therefore deny same.

191.    Small changes in these variables can cause the compounded drug to lose strength or have a shorter shelf-life.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 191 and therefore deny same.

192.    It is imperative to test both stability and sterility multiple times over a compounded drug's shelf-life, not just shortly after it is compounded.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 192 and therefore deny same.

193.    Many laboratories that hold themselves out as facilities that test compounded drugs are sub-standard.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 193 and therefore deny same.

194.    To gauge the quality of any compounded drugs, it is important to know both

the results of the testing and the identity of the laboratory that

performed the testing.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 194 and therefore deny same.

195.    Compounded drugs are generally less stable than manufactured drugs for

several reasons. *Id.* at 21.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 195 and therefore deny same.

196.    Compounded drugs are less stable than manufactured drugs because they

are made in small, patient-specific batches without cGMP conditions and

without rigorous testing. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 196 and therefore deny same.

197.    Stability of compounded drugs can be further compromised by variations in

compounding techniques, environmental conditions, and the quality of raw

materials and APIs. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 197 and therefore deny same.

198.    Packaging also plays a critical role; manufactured drugs are typically

sealed in tamper-evident, sterile and protective containers designed to

maintain stability over shelf-life, whereas compounded drugs are often stored

in simpler containers that generally do not provide the same protection from

light, moisture and air. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 198 and therefore deny same.

199. Transportation conditions can significantly impact the quality and stability of compounded drugs. Exposure to extreme temperatures, excessive humidity and sunlight can accelerate chemical degradation, reduce potency or promote microbial growth. Prolonged transit or transit delays can allow these environmental factors to compromise the product. *Id.* at 22.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 199 and therefore deny same.

200. Proper packaging, temperature control and timely delivery are essential to ensure compounded medications maintain their intended safety, potency and sterility. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 200 and therefore deny same.

### 6). <u>The Indiana Department of Corrections, through its secretive procurement practices, is paying extortionate prices for what is ordinarily an inexpensive drug.</u>

201. Wholesale Acquisition Cost (WAC) and Average Wholesale Price (AWP) are two commonly used pricing benchmarks in the pharmaceutical industry. *Id.* at 20 -21.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 201 and therefore deny same.

202.    WAC represents the manufacturer's list price for a drug sold to wholesalers or direct purchasers before any discounts, rebates or other price concessions. It provides a baseline for estimating acquisition costs but does not necessarily reflect the actual price paid. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 202 and therefore deny same.

203.    AWP is a benchmark or suggested price that wholesalers use when selling to pharmacies and is often referred to as a "sticker price." It is typically a higher price than the WAC and is primarily used for reimbursement and insurance billing purposes rather than reflecting actual transaction prices. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 203 and therefore deny same.

204.    In essence, WAC reflects the manufacturer's set cost to distributors, while AWP serves as a reference for pricing and reimbursement in the pharmacy supply chain. *Id.* at 20 -21.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 204 and therefore deny same.

205.    According to the Red Book, the WAC per package of manufactured pentobarbital sodium injectable formulation 50 mL vial with 50 milligrams per mL strength is $2,257.00 (Hikma) and $2,100 (Sagent). *Id.* at 21.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 205 and therefore deny same.

206.    According to the article published by the Indiana Capital Chronicle,

54

Governor Mike Braun disclosed that IDOC spent $1.175 million on four doses of injectable pentobarbital. This means the state overpaid by a factor of over 130 times the typical market price. *Id.*

**ANSWER:** The referenced article speaks for itself. Defendants deny the remaining allegations contained in paragraph 206.

207.    On May 6, 2025, Governor Mike Braun signed into law Senate Enrolled Act 5 (S.E.A. 5) which became effective on July 1, 2025. S.E.A. 5, 110th Gen. Assemb. Reg. Sess. (Ind. 2025) (amending IC 4-13-1-29).

**ANSWER:** S.E.A. 5 speaks for itself. Defendants deny any remaining allegations contained in paragraph 207.

208.    S.E.A. 5 prohibits a state agency from entering into a non-public contract.

**ANSWER:** S.E.A. 5 speaks for itself. Defendants deny all remaining allegations contained in paragraph 208.

209.    S.E.A. 5 requires that all contract opportunities of a state agency to be posted as a request for proposals or a request for quotations on the department's website at least 30 days before the contract being awarded.

**ANSWER:** S.E.A. 5 speaks for itself. Defendants deny all remaining allegations contained in paragraph 209.

210.    IDOC's Execution of Death Sentence Protocol (ISP 06-26) contains numerous gaps and deficiencies. Under ISP 06-26, staff selected for the execution team are not licensed to perform medical procedures. The IV team is composed of prison personnel trained to start IVs.

**ANSWER:** ISP 06-26 speaks for itself. Defendants deny all remaining allegations contained in paragraph 210.

211.    Although a licensed physician is designated to provide guidance on the

preparation and administration of lethal chemicals, ISP 06-26 lacks detailed instructions on several critical aspects of the administration of a lethal dose of injectable pentobarbital. These include no detailed instructions concerning the handling, storage, transfer, and environmental conditions necessary for proper injection of pentobarbital. Exhibit P4 at 27.

**ANSWER:** ISP 06-26 speaks for itself. Defendants deny all remaining allegations contained in paragraph 211.

212.  Becoming IV proficient requires both formal training and hands-on practice under supervision. Nursing and medical programs included didactic instructions on anatomy, technique and safety, followed by practical experience on mannequins or simulation arms. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 212 and therefore deny same.

213.  In medical training, IV insertion competence generally develops after performing 20 or more supervised successful insertions on real patients, though some individuals may require more practice depending on dexterity and confidence. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 213 and therefore deny same.

214.  It is uncertain that prison staff who comprise the execution team have sufficient IV insertion experience or training. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 214 and therefore deny same.

215.    Additionally, there is no documented procedure to verify the drug intended for lethal injection meets appropriate standards of potency and purity. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 215 and therefore deny same.

216.    A Certificate of Analysis ("CoA") is an official document that verifies a drug's quality and conformity to specified standards. A typical CoA includes the drug name and identification number, test results concerning the drug's physical, chemical and microbiological characteristics, specifications concerning the composition, purity and quality of the drug, the testing methods employed to reach these conclusions, an interpretation of the results and a certificate that the drug meets acceptable standards. *Id*. at 6.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 216 and therefore deny same.

217.    CoAs are important because they certify regulatory compliance and quality assurance. They are also important for traceability because CoAs include batch numbers and manufacturing dates. *Id*.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 217 and therefore deny same.

218.    ISP 06-26 makes no provision for the procurement and review of the CoA for the injectable pentobarbital. *Id*. at 27-28

**ANSWER:** ISP 06-26 speaks for itself. Defendants are without information or knowledge to sufficiently respond to the remaining allegations contained in paragraph 218.

219.    IDOC personnel handling the drug, and even the physician overseeing the

57

process, may lack training and experience to visually assess the drug for potential physical changes such as change of color or the formation of a precipitant. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny Plaintiff's speculative allegations contained in paragraph 219 and therefore deny same.

220.    ISP 06-26 makes no mention of monitoring the injectable pentobarbital storage environment. Proper storage conditions are critical for all medications, but for compounded drugs in particular as they are highly sensitive to environmental factors that affect stability and potency. This is especially true for injectable pentobarbital whose chemical composition makes it particularly vulnerable to degradation under improper conditions. *Id.*

**ANSWER:** ISP 06-26 speaks for itself. Defendants deny any remaining allegations contained in paragraph 220.

221.    Storage environments should be continuously monitored for temperature and humidity to ensure the drug remains uncompromised with all measurements carefully recorded. ISP 06-26 makes no provision for these practices. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 221 and therefore deny same.

222.    Further, if the drug's chain of custody is unknown there are significant risks the injectable pentobarbital is manipulated, contaminated or compromised at any point before use. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 222 and therefore deny

same.

223.    Use of contaminated or compromised injectable pentobarbital in executions, can cause extreme pain upon injection and painful unintended side effects. *Id.* at 16-17. 28-29.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 223 and therefore deny same.

> **F. Use of Pentobarbital as a lethal injection method causes flash pulmonary edema and the associated terror of the feeling of drowning, in addition to other painful sensations such as extreme burning as the pentobarbital enters the bloodstream.**
>
>> 1). **The painful and terror-inducing effects of pentobarbital's use in executions are well known.**

224.    The use of injectable pentobarbital to execute people has fallen under intense scrutiny because of the likelihood it inflicts needless pain and suffering in violation of the Eighth Amendment.  On September 21, 2020, NPR published a comprehensive investigation of lethal inject executions in the United States and in those involving pentobarbital, 49 inmates out of a total of 58 executed experienced painful pulmonary edema.  *See* Noah Caldwell, "Gasping for Air: Autopsies Reveal Troubling Effects of Lethal Injection," National Public Radio (Sept. 21, 2020) available at ttps://www.npr.org/2020/09/21/793177589/gasping-for-air-autopsies-reveal-troubling-effects-of-lethal-injection .

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 224 and therefore deny same.

225.    On January 25, 2025, Attorney General Merrick Garland directed the

Director of the Federal Bureau of Prisons to rescind the addendum to the federal execution protocol first put in place on July 25, 2019 which provided for lethal injection by pentobarbital because after careful study "it cannot be said with reasonable confidence that the current execution protocol 'not only afford[s] the rights guaranteed by the Constitution and laws of the United States' but 'also treat[s] individuals [being executed] fairly and humanely.'" See Garland Memorandum, Exhibit P7 at 2. Garland wrote the Department of Justice should "err on the side of treating individuals humanely and avoiding unnecessary pain and suffering." *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 225 and therefore deny same.

226.    Garland's position is likely the result of what transpired when the federal government resumed executions in the early 2020s.  Thirteen federal inmates were executed under the protocol set out in the addendum referenced by Garland, a one-drug lethal injection protocol utilizing a high dose of injectable pentobarbital, just like the current protocol in Indiana.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 226 and therefore deny same.

227.    Prior to the federal executions, experts warned that high dose pentobarbital injections would likely cause needless pain and suffering due to flash pulmonary edema which would cause the condemned inmate to experience the terrifying sensation of drowning.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 227 and therefore deny same.

228.    Anesthesiologist Gail Van Norman filed a declaration in the federal lethal injection litigation expressing the opinion that the federal lethal injection protocol using a high dose of pentobarbital "will subject executed prisoners to severe pain and suffering, when they remain conscious and aware prior to their deaths." *See* Van Norman Declaration, United States District Court for the District of Columbia Case No. 1:19-mc-00145-TSC, Exhibit P8 at 6.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 228 and therefore deny same.

229.    In her declaration, Dr. Van Norman cautioned that consciousness and unresponsiveness are "distinct and should not be confused." Barbiturates do not guarantee a lack of consciousness, even when the patients appear to be unconscious by all clinical measures and are unresponsive, and consciousness will permit extreme pain and suffering during the execution process. Van Norman explained the effect "of IV short-acting barbiturates is unresponsiveness, and it is extremely likely that prisoners given even high doses of barbiturates retain consciousness long enough to experience pain and suffering during the execution process using single-drug pentobarbital." *Id.* at 7.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 229 and therefore deny same.

230.  Barbiturate administration does not prevent pain from being felt during

periods of awareness. It is a virtual medical certainty that prisoners who remain aware after high-dose administration of an IV barbiturate such as pentobarbital are capable of feeling pain, terror and suffocation. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 230 and therefore deny same.

231.    Van Norman explained that IV injection of high-dose barbiturates, including pentobarbital, has been shown to be associated with "flash" pulmonary edema in both animals and humans. Flash pulmonary edema is a rapid onset of fluid accumulation in the lungs causing severe shortness of breath and other symptoms. It is a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering, including sensations of drowning and suffocation, as a result of an IV injection of 5 grams of pentobarbital. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 231 and therefore deny same.

232.    Van Norman also explained that "[p]entobarbital can cause excruciating pain if injected rapidly into veins, particularly if extravasation or infiltration of the peripheral IV catheter occurs, or if inadvertent intra- arterial injection occurs. She wrote that it is common for IV problems to result in extravasation or infiltration that would cause significant, excruciating pain for prisoners undergoing lethal injection with IV barbiturates. *Id.* at 9.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 232 and therefore deny same.

233. Van Norman cautioned that these risks are even more present when injectable pentobarbital is obtained from compounding pharmacies. Pentobarbital obtained from compounding pharmacies are very likely to suffer from quality issues, the most common of which is lack of potency, and the risk is pervasive, even among more tightly regulated outsourcing facilities. Van Norman warned that it is extremely likely that use of compounded pentobarbital will subject prisoners "to injection of an inferior, subpotent drug that vastly increases the risk that execution will be prolonged and the prisoner will suffer prolonged feelings of pain and suffocation." *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 233 and therefore deny same.

234. Significantly, flash pulmonary edema can only occur when someone is alive. It is a virtual medical certainty that most prisoners will experience excruciating suffering, including sensations of drowning and suffocation from pentobarbital. *See* Michael Tarm, "Lawyers: Autopsy suggests inmate suffered during execution," The Washington Post, (August 21, 2020) available at https://www.washingtonpost.com/national/lawyers-autopsy-suggests-inmate-suffered-during-execution/2020/08/21/9ca7e3ca-e40f-11ea-82d8-5e55d47e90ca_story.html (quoting Van Norman).

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 234 and therefore deny same.

235. In the federal litigation, Dr. Mark Edgar, a board-certified anatomic

pathologist, also filed a declaration describing the painful and terrifying effects of high-dose pentobarbital. *See generally* Expert Declaration of Mark A. Edgar, M.D., United States District Court for the District of Columbia Case No. 1:19-mc-00145-TSC, Exhibit P9.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 235 and therefore deny same.

236. Dr. Edgar explained that pulmonary edema is the movement of fluid from small blood vessels in the lung into the air spaces. The presence of fluid in airspaces interferes with normal gas exchange which reduces the amount of oxygen in the blood. It increases the work of breathing and with increasing severity it greatly increases the work of breathing such that the chest muscles and diaphragm strain as the expend greater effort to move air into the lungs. It is this effort to breathe that produces sensations similar to drowning or asphyxiation as the fluid occupies a greater volume of the air spaces. Severe pulmonary edema is an "intolerable state that produces panic and terror." *Id.* at 3.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 236 and therefore deny same.

237. Dr. Edgar explained that the sensations of drowning and asphyxiation are increased when the subject is lying flat, as prisoners are during lethal injection executions. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 237 and therefore deny same.

238.     The warnings of Van Norman and Edgar proved to be true.  For example, the autopsy of Corey Johnson, one of the thirteen federal inmates executed during the first Trump administration, revealed he suffered from pulmonary edema to such an extent that fluid rushed up his trachea and some exited his mouth.  *See* Michael Tarm, "Fuller picture emerges of the 13 federal executions at the end of Trump's presidency," Associated Press (October 3, 2023) available at   https://apnews.com/article/trump-executions-biden-death-penalty-brandon-bernard-c1b26807c5c40b337d14485c3d6df2de .

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 238 and therefore deny same.

239.     In addition to the suffering of Corey Johnson, Wesley Purkey also experienced severe bilateral acute pulmonary edema, and frothy pulmonary edema was found in his trachea and mainstream bronchi.  *See* Michael Tarm, "Lawyers:  Autopsy  suggests  inmate  suffered  during  execution,"  The Washington  Post,  (August  21,  2020)  available  at https://www.washingtonpost.com/national/lawyers-autopsy-suggests-inmate-suffered-during-execution/2020/08/21/9ca7e3ca-e40f-11ea-82d8-5e55d47e90ca_story.html .  This meant that fluid quickly filled Purkey's lungs and entered his airway up to his trachea causing a "near-drowning" experience. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 239 and therefore deny same.

240.    Recently, on August 5, 2025, the State of Tennessee utilized its newly-adopted pentobarbital-only lethal injection protocol to execute Byron Black. During his execution, Black "groaned for several minutes, and told his spiritual advisor he was in pain." *See* Catherine Sweeney, "Autopsy sheds light on Byron Black's painful execution," 90.3 WPLN News (Sept. 11, 2025) available at https://wpln.org/post/autopsy-sheds-light-on-byron-blacks-painful-execution/ . Black lifted his head off the gurney several times and said, "oh, it is hurting so bad" as the drugs flowed. *See* Jonathan Mattise, "Attorney says heart device did not shock Tennessee man in execution who said he was 'hurting so bad.'" 90.3 WPLN News (August 8, 2025) available at https://wpln.org/post/attorney-says-heart-device-did-not-shock-executed-tn-man-who-said-he-was-hurting-so-bad/ . Black's autopsy revealed he developed pulmonary edema during the execution. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 240 and therefore deny same.

241.    There are unfortunately numerous examples of inmates experiencing pain and suffering during lethal injection executions involving pentobarbital.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 241 and therefore deny same.

242.    Given the difficulties in obtaining pentobarbital for lethal injection executions, there is reason to be concerned that states actively executing inmates using pentobarbital are procuring pentobarbital from the same source.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 242 and therefore deny same.

2).    **Benjamin Ritchie displayed symptoms of distress and a physical reaction to pain during his execution.**

243.    Based on the pharmacodynamics and pharmacokinetics of pentobarbital, administration of the drug during lethal injection should result in rapid unconsciousness and death. But as Dr. Norman explained, the lack of consciousness is not always immediately achieved.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 243 and therefore deny same.

244.    Five witnesses to Benjamin Ritchie's execution on May 20, 2025, report that after pentobarbital was administered, he experienced outward symptoms consistent with unnecessary pain and suffering. All five witnesses report seeing Ritchies upper torso suddenly lurch upward against the physical restraints holding him to the gurney.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 244 and therefore deny same.

245.    One witness, Amanda Johnson, has known Ritchie since the sixth grade. Affidavit of Ritchie Witness Amanda Johnson, Exhibit P10 at 1. During the execution, she saw Ritchie "suddenly and strongly" raise his torso up from the gurney but was held back by the restraints. *Id.* at 3. Ritchie seemed to be trying to break out of "something." *Id.* This happened about two to three minutes after the blinds covering the viewing window first opened. Ritchie's sudden reaction

lasted five to six seconds. It was upsetting to Johnson, and she remembers saying to Mark Koselke, "I don't think I can do this. I can't do this." *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 245 and therefore deny same.

246. Steven Schutte, one of Ritchie's attorneys, also remembers Ritchie violently lurching forward during the execution. *See* Affidavit of Ritchie Witness Steven Schutte, Exhibit P11 at 2. He remembers that seconds after Ritchie stopped moving "he violently lurched forward and up as if to sit up, but he was restrained." Schutte said it was almost like a spasm that lasted three to five seconds, after which Ritchie laid back down. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 246 and therefore deny same.

247. Attorney Mark Koselke similarly describes that after Ritchie started to become motionless, he "seemed to shoot up" like "he was doing a crunch" because his head and shoulders lifted sharply from the gurney. Affidavit of Ritchie Witness Mark Koselke, Exhibit P12 at 2. He remembers Amanda Johnson being so startled by Ritchie's movements that she grabbed his arm. Koselke remembers Ritchie lifting up for "about three to five seconds." He then began focusing on Ritchie's chest and counted about six to seven breaths, each one becoming more shallow until Ritchie stopped breathing. *Id.* at 2-3. Koselke also remembers Ritchie's spiritual advisor looking "horrified" as he was escorted from the chamber. *Id.* at 3.

**ANSWER:** Defendants are without sufficient information or knowledge to

admit or deny the allegations contained in paragraph 247 and therefore deny same.

248.    Hannah Hall reported when the blinds opened allowing her to see into the chamber, Ritchie's feet were moving, and it looked like he was talking or singing. *See* Affidavit of Ritchie Witness Hannah Hall, Exhibit P13 at 2 - 3. She remembers Ritchie "settl[ing] down a little" and not moving as much as when the blinds were first opened. *Id.* at 3. Then Ritchie's "upper body jerked up" and although restrained, "his head and shoulders came up." *Id.* She remembers it being so "violent and so unexpected" that Amanda Johnson punched Mark Koselke's arm. *Id.* Ritchie lifted for about two to three seconds. When this happened, she noticed Ritchie's spiritual advisor startle and "push back" in his chair. *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 248 and therefore deny same.

249.    Ritchie's spiritual advisor present in the chamber, was interviewed by Kathleen Cleary, an attorney licensed in Indiana and a mitigation investigator with the Capital Habeas Unit of the Federal Defender for the Western District of Missouri. The spiritual advisor was reluctant to sign an affidavit about what he witnessed during the execution because he signed a document promising not to reveal the identity of those involved in Ritchie's execution. He also fears that if he signs an affidavit, the IDOC will not allow him to continue his prison ministry. See Affidavit of CHU Investigator Kathleen Cleary, Exhibit P14 at 2. Cleary prepared an affidavit documenting her interview with the spiritual

advisor, which she reviewed with him to ensure accuracy before signing it.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 249 and therefore deny same.

250.   The spiritual advisor told Cleary that after the execution began, Ritchie lifted several inches off the gurney and against the restraints. *Id.* at 1. Ritchie's struggle against the restraints startled the spiritual advisor so much that he pushed back against the chair he was sitting in. *Id.* He told Cleary this lasted about two seconds, and when Ritchie laid back down, it was about five seconds later when Ritchie was "gone." *Id.*

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 250 and therefore deny same.

251.   No press witnesses were allowed to view Ritchie's execution because Indiana Code § 35-38-6-6(a) does not list members of the press as a separate category of witnesses authorized to witness executions. The Associated Press and other news organizations have filed a civil rights lawsuit arguing Indiana Code § 35-38-6-6(a) violates their rights under the First Amendment. *See generally* Southern District of Indiana Case No. 1:25-cv-00872-MPB-MJD, Dkt.9 (May 7, 2025).

**ANSWER:** Ind. Code § 35-38-6-6(a) sets forth who is permitted to view the execution. The statute speaks for itself. Defendants admit the Associated Press, among other news organizations, filed a civil rights lawsuit arguing Ind. Code § 35-38-6-6(a) violated their First Amendment rights and the preliminary injunction was denied. Defendants deny any remaining allegations contained in paragraph 251.

252.   Witnesses to Benjamin Ritchie's execution describe being unable to hear

what was going on in the execution chamber. The witnesses could see Ritchie's mouth moving but could not hear what he was saying. The witnesses also could not see the execution in its entirety. The intravenous lines were already inserted when the blinds were opened, and the witnesses could see Ritchie strapped to the gurney in the execution chamber. Due to the size and angle of the witness room to execution chamber, the view of the witnesses was partially obstructed.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 252 and therefore deny same.

253.   The state performed only an external autopsy and toxicology studies on Ritchie after his death. *See* Ritchie Coroner Report, Exhibit P15 and Exhibit P2. Thus, it is unknown whether Ritchie suffered from pulmonary edema during his execution.

**ANSWER:** Defendants are without sufficient information or knowledge to admit or deny the allegations contained in paragraph 253 and therefore deny same.

### G. The IDOC has been non-responsive to Ward's timely requests for public information.

254.   Ward has made multiple public records requests for information about Indiana's lethal injection protocol, none of which are designed to seek information "reasonably calculated to lead to the identity" of its supplier of pentobarbital. *See* Ind. Code. § 35-38-6-1(f)(4). Ward has made four separate requests for public information -- on May 8, June 9 and July 14, September 5, 2025. See Exhibits P16, P17, P18 and P19, respectively.

**ANSWER:** Defendants deny the allegations contained in paragraph 254.

255.    On May 8, 2025, before the state sought an execution warrant and before Ritchie was executed on May 20, 2025, Ward requested the IDOC provide public records concerning any and all drugs in its possession intended for use in executions including the number of vials it possessed, the size of each vial and the concentration of lethal drug in each vial.  He also requested lethal injection drug inventory logs or chain of custody documents for such drugs, including documents relating to the date of purchase.  Ward further requested the amount of money the IDOC paid for lethal injection drugs.  The request was for documents for lethal injection drugs acquired from January 1, 2023, to the date of his request.  Exhibit P16.

**ANSWER:** Defendants deny the allegations contained in paragraph 254.

256.    On June 9, 2025, before the state sought an execution warrant for Ward and after the Ritchie execution, Ward renewed his request made on May 8 and requested additional public information. This request was made after the Governor of Indiana, Mike Braun, publicly announced that Indiana was out of lethal injection drugs and did not intend to purchase more.  *See* Casey Smith, "*Braun says Indiana is out of execution drugs, signals willingness to debate capital punishment*," INDIANA CAPITAL CHRONICLE, June 4, 2025, available at https://indianacapitalchronicle.com/2025/06/04/braun-says-indiana-is-out-of-execution-drugs-signals-willingness-to-debate-capital-punishment/ ("Governor Braun also said the State of Indiana does not intend to buy more, 'at least not for now.'"). Given Governor Braun's statements, Ward requested financial documents related to IDOC's purchases, retention and

storage of lethal injection drugs and documents concerning its obligation to comply with Indiana's competitive bidding law. Ward broadly requested all logs related to the purchase of lethal injection drugs including the date of purchase and expiration dates, all certificates of analysis, all DEA Form 222s from June 2024 to present, documentation of the expiration dates of lethal injection drugs used in executions and financial documents related to IDOC's acquisition, purchase, retrieval, storage and maintenance of use of lethal injection drugs. Exhibit P17.

**ANSWER:** The article speaks for itself. Defendants deny any remaining allegations contained in paragraph 256.

257.    On July 14, 2025, after the Indiana Supreme Court set a tentative execution date of October 10, 2025, Ward supplemented his public records requests made on May 8 and June 9 and made additional public records requests. His request was lengthy and included requests for all documents related to the quality and testing of the lethal injection drug intended for use in his execution, including certificates of analysis. He also requested DEA Form 41 for lethal injection drugs it has destroyed since May of 2024. Exhibit P18. Another impetus for the request was uncontradicted sworn affirmations that Ritchie's execution was flawed.

**ANSWER:** Defendants admit the Indiana Supreme Court set a tentative date. Defendants deny the remaining allegations contained in paragraph 257.

258.    On September 5, 2025, after the Indiana Supreme Court formally set an execution date of October 10, 2025, Ward reaffirmed his prior requests and made a supplementary request to ensure his requests covered pentobarbital

not yet purchased by IDOC.  Exhibit P19.

**ANSWER:** Defendants admit the on September 5, 2025, Indiana Supreme Court formally set an execution date of October 10, 2025. Defendants deny the remaining allegations contained in paragraph 258.

259.    On September 8, 2025, the IDOC provided an incomplete response to Ward's multiple public records requests.  The IDOC responded to Ward's May 8, 2025, request by providing six Flammable Toxic and Caustic Inventory/Issue Logs. The logs are completely redacted except for the word "Pentobarbital", "Indiana State Prison" and "X-Row Chemical Safe." As an example:



**ANSWER:** The response speaks for itself, and the defendants deny that their response was incomplete. Defendants deny any remaining allegations contained in paragraphs 259.

260.    It provided DEA-Form 222 which is completely redacted except for the word "Pentobarbital" repeated on three different lines.



**ANSWER:** The form speaks for itself. Defendants deny any remaining allegations contained in paragraph 260.

261.    An Invoice was produced revealing the purchase amount of $275,000.  All

other information is redacted. A Memorandum that appears to authorize the special purchase of lethal injection drugs under I.C. §§ I.C. 5- 22-10-9 and 13. The date, author and recipient of the Memorandum are redacted but Eric Holcomb is named as Governor in the letterhead indicating the authorization was issued in 2024, the last year of his governorship. A redacted Professional Services Contract was provided but the unredacted information in the contract is not responsive to any of Ward's requests.

**ANSWER:** The documents speak for themselves. The defendants deny that Mr. Ward made any requests and any remaining allegations in paragraph 261.

262.  The letter [fn. 4 – The letters accompanying the documents are dated September 3, 2025 and September 4, 2025 but were mailed to counsel for Ward on September 8, 2025] that accompanied the documents stated some records were withheld under I.C. § 35-38-6-1(f), because this would jeopardize the security system or lead to a terrorist attack.  There was simply an explanation by fiat.

**ANSWER:** The letter speaks for itself, and the defendants deny the characterization of the explanation. Defendants deny any remaining allegations in paragraph 262.

263.    In response to Ward's June 9, 2025, the IDOC turned over what appear to be the same six Flammable Toxic and Caustic Inventory/Issue Logs and DEA Form-222 that were turned over in response to his May 8th request. The letter accompanying the documents gave the same reasons for withholding requested documents but added that Ward's request was not made with reasonable particularity.

**ANSWER:** The response and letter speak for themselves. Defendants deny any remaining allegations contained in paragraph 263.

264.   The only new documents produced in response to Ward's July 14, 2025, request were two redacted DEA Form-41's. One of these documents reveals that pentobarbital was burned at Putnamville Correctional Facility in Greencastle, Indiana on June 6, 2025. The other appears to purport that two doses of pentobarbital were destroyed on July 10, 2025, at the Indiana State Prison by pouring them into kitty litter.  Again, the letter gives the same reasons for withholding information from Ward. *See* Exhibit P20.Ward's September 5, 2025 request remains pending.  Given the slowness of the previous responses, Ward does not anticipate hearing anything soon from IDOC in response. he [sic] IDOC has not truly and completely answered Ward's lawful public records requests even though Indiana's public records law is liberally construed and recognizes that disclosure of public "information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information." Ind. Code § 5-14- 3-1.  Further, the IDOC has failed to offer any explanation for its failure to comply even though "the burden of proof for the nondisclosure of a public record [is] on the public agency that would deny access to the record and not on the person seeking to inspect and copy the record." *Id.*

**ANSWER:** The cited references documents speak for themselves. Defendants deny any remaining allegations contained in paragraph 264.

VII.   CLAIMS FOR RELIEF

265.   Ward re-alleges and incorporates herein by reference all the allegations in

the proceeding paragraphs.

**ANSWER:** Defendants incorporate by reference their answers to rhetorical
paragraphs 1 – 264 of Plaintiff's Complaint as if each were expressly set forth
herein.

A.   **First Claim for Relief: First Amendment Right of Access to Governmental
Proceedings.**

266.   The First Amendment right of access to governmental proceedings

guarantees the public and the press a measure of access to governmental

proceedings to ensure that public discussion of governmental affairs is

informed. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05

(1982).

**ANSWER:** These assertions do not relate to Count 4.

267.   "Public viewing of executions in their entirety is rooted in historical

tradition and that public observation plays a significant role in the functioning

of capital punishment." *First Amendment Coalition of Arizona, Inc. v. Ryan*,

938 F.3d 1069, 1075 (9th Cir. 2019). This right includes hearing the sounds of

the execution so witnesses to the execution can "observe and report on the

entire process so that the public can determine whether lethal injections are

fairly and humanely administered." *First Amendment Coalition of Arizona*,

938 F.3d at 1075.

**ANSWER:** These assertions do not relate to Count 4.

268.   Witnesses to Indiana's most recent executions report they could hear no

sound emanating from the execution chamber. Witnesses to Benjamin Ritchie's execution report he "seemed to be talking or singing" but they "could not hear him." Affidavit of Hannah Hall, Exhibit P13 at 2 -3. They could hear "nothing from the execution chamber." *Id.* at 3.

**ANSWER:** These assertions do not relate to Count 4.

269.    Without sound, witnesses to Ward's execution will not be able to determine whether his lethal-injection execution is carried out fairly and humanely because words and sounds are often the first clue of pain and suffering. For example, in the survey of executions contained in the affidavit of Dr. Mark Edgar, words and sounds are the first signs of distress. Inmate John Battaglia gasped twice and started to snore. *See* Exhibit P9 at 8. Danny Bible "it burned." *Id.* Lester Bower took deep breaths and made grunting, snore-like sounds. *Id.* at 9. Billy Crutsinger said he could feel burning in his left arm and made snoring noises at least 29 times before he stopped moving. *Id.* at 10.

**ANSWER:** These assertions do not relate to Count 4.

270.    The most recent execution involving pentobarbital, that of Byron Black, also illustrates how crucial being able to hear sound from the execution chamber is to assess pain and suffering. Black lifted his head off the gurney several times and said, "oh, it is hurting so bad" as the drugs flowed. *See* Jonathan Mattise, "Attorney says heart device did not shock Tennessee man in execution who said he was 'hurting so bad.'" 90.3 WPLN News (August 8, 2025), . The autopsy completed on Black has reported the existence of flash pulmonary edema.

**ANSWER:** These assertions do not relate to Count 4.

271.  Ward has the constitutional right to have what transpires during his execution fully accessible to those who witness his execution and by blocking sound from the execution chamber, the IDOC deprives Ward of this right.

**ANSWER:** These assertions do not relate to Count 4.

**B. Second Claim for Relief:  The IDOC's failure to provide Ward the information to which he is legally entitled to Ward's public records requests about its lethal injection protocol and the drugs it intends to use to carry out his execution actively conceals public information and obstructs his ability to challenge the constitutionality of his execution in court in violation of his First Amendment right to petition the government for redress of grievances**

272.  The First Amendment's Petition Clause creates a right to "petition the Government for redress of grievances.  The Fourteenth Amendment due process clause includes the right to petition state and local governments for redress of grievances. *See Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016).

**ANSWER:** These assertions do not relate to Count 4.

273.  The First Amendment right to petition the government for redress of grievances includes the right of *meaningful* access to the courts. *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004)(emphasis added).  The right of access to the courts is the right of an individual, whether free or incarcerated, to obtain access to the courts without undue interference. *Id.*

**ANSWER:** These assertions do not relate to Count 4.

274.  The IDOC's refusal to be responsive to Ward's public records requests about its lethal injection protocol actively conceals his access to public information not shielded from disclosure by statute and actively obstructs his ability to

79

challenge the constitutionality of his execution in court. *See Snyder*, 380 F.3d at 291 (access to the courts must be free from "undue interference."); *and John L. v. Adams*, 969 F.2d 228, 235 (6th Cir. 1992) (the state may not erect barriers that "impede" the right).

**ANSWER:** These assertions do not relate to Count 4.

275.    By deliberately refusing to provide Ward with public information about the pentobarbital it intends to use in his execution, the IDOC has erected a condition that frustrates Ward's ability to litigate his claims related to the constitutionality of his execution.

**ANSWER:** These assertions do not relate to Count 4.

276.    This frustrating condition deprives Ward of his First Amendment right to petition the government for redress of grievances.

**ANSWER:** These assertions do not relate to Count 4.

277.    This frustrating condition deprives Ward of his access to the courts.

**ANSWER:** These assertions do not relate to Count 4.

278.    The IDOC's intentional refusal to provide public information that would enable Ward to determine the pentobarbital it plans to use is transported and stored correctly, tested to ensure quality, and administered correctly deprives him of his ability to determine whether the state can carry out his execution in a lawful, constitutional manner.

**ANSWER:** These assertions do not relate to Count 4.

**C. Third Claim for Relief: IDOC's refusal to provide public information violates Ward's Fourteenth Amendment Right to Due Process**

279.   The right of individuals to pursue legal redress for claims that have a reasonable basis in law or fact is not only protected by the First Amendment right to petition for redress of grievances, but also the Fourteenth Amendment right to substantive due process. *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004).

**ANSWER:** These assertions do not relate to Count 4.

280.   The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property, without due process of law.

**ANSWER:** These assertions do not relate to Count 4.

281.   Fairness and due process require that an individual be given an opportunity to receive notice of how one's rights will be affected and an opportunity to respond and be heard.

**ANSWER:** These assertions do not relate to Count 4.

282.   The IDOC has deprived Ward of non-identifying information about the pentobarbital it purchases for executions despite multiple requests.

**ANSWER:** These assertions do not relate to Count 4.

283.   This information is not protected from disclosure by Indiana statute because it does not reveal the identity of IDOC's supplier of pentobarbital.

**ANSWER:** These assertions do not relate to Count 4.

284.   The IDOC's refusal to provide Ward with this information raises a procedural barrier to challenging the constitutionality of IDOC's execution

process including whether it will cause needless pain and suffering in violation of the Eighth Amendment. Ward is further denied any effective remedy to enforce compliance with the Constitution. Without reliable information, the courts cannot meaningfully review the constitutionality of Ward's execution.

**ANSWER:** These assertions do not relate to Count 4.

285.   By depriving Ward of the information necessary to challenge the execution procedures to be used, IDOC has violated Ward's rights to Due Process.

**ANSWER:** These assertions do not relate to Count 4.

D. **Fourth Claim for Relief: Executing Ward will violate the Eighth Amendment because after what transpired during the execution of Benjamin Ritchie through utilizing Indiana's Method 2 lethal injection protocol IDOC will knowingly and with intent inflict needless pain and torment. *Baze v. Rees*, 553 U.S. 35, 94 (2008).**

286.   The Eighth Amendment prohibits states from inflicting cruel and unusual punishment. It forbids "the infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 (1947). It prohibits a "method of execution" that is "deliberately designed to inflict pain." *Baze v. Rees*, 553 U.S. 35, 94 (2008)(Thomas, J., concurring in judgment).

**ANSWER:** The cited sources speak for themselves. Defendants deny any remaining allegations contained in paragraphs 286.

287.   Cruel punishments are those that involve pleasure in hurting others or involve intentionally hard-heartedness, inhumanity and a lack of compassion. *See Bucklew v. Precythe*, 587 U.S. 119, 130 -31 (citing historical definitions of

82

"cruel" to explain what cruel and unusual punishments are in the constitutional sense). Cruel punishments also involve mental pain and torment. *Id.*

**ANSWER:** The cited sources speak for themselves. Defendants deny any remaining allegations contained in paragraphs 287.

288. Readily available information establishes that pulmonary edema will occur virtually instantaneously upon administration of pentobarbital at a time when the inmate remains capable of feeling pain, terror and suffocation.

**ANSWER:** Defendants deny the allegations contained in paragraph 288.

289. Five witnesses to Ritchie's execution on May 20, 2025, report that he was not unconscious upon administration of pentobarbital and that he lurched upward against his restraints. As immediately noted in news articles after the execution, a professor emeritus from the Ohio State University College of Medicine said, "It should be really, really effective – really fast. No one should move . . . It's just lights out, go to sleep, no reaction, no coughing, no nothing. They just don't move." *See* Casey Smith, *"'Violent' moment during Indiana execution draws scrutiny; DOC official deny 'botched' process,"* INDIANA CAPITAL CHRONICLE (May 22,2005), https://indianacapitalchronicle.com/2025/05/22/violent-moment-during-indiana-execution-draws-scrutiny-doc-officials-deny-botched-process/.

**ANSWER:** The quoted sources speak for themselves. Defendants deny any remaining allegations contained in paragraphs 289.

290. Ritchie must have experienced symptoms consistent with pain and suffering. No autopsy was performed so it is not known conclusively that the

pentobarbital used to execute him caused pulmonary edema, but given the physical reaction it is the only reasonable inference.

**ANSWER:** Defendants deny the allegations contained in paragraphs 290.

291.    Even before Ritchie's execution, the State of Indiana and the IDOC must have been aware that single drug lethal injection protocols involving the use of pentobarbital caused pulmonary edema and the associated feelings of suffocation and drowning because the thirteen federal inmates executed with pentobarbital were executed in Indiana at the United States Penitentiary in Terre Haute, Indiana, and the pulmonary edema problems associated with those executions are well known.

**ANSWER:** Defendants deny the argumentative assertions contained in paragraphs 291.

292.    IDOC must also be aware of the problems associated with the pentobarbital execution of Byron Black in the nearby State of Tennessee.

**ANSWER:** Defendants deny the argumentative assertions contained in paragraphs 292.

293.    IDOC must also be aware of the well-known safety and efficacy issues with compounded drugs in general and compounded injectable pentobarbital in particular because such information is also readily available. IDOC is certainly hesitant to release information relevant to the safety of the pentobarbital it purchases for executions, a fact which supports the conclusion that it is indifferent to the pain and suffering administering adulterated or expired pentobarbital can cause.

84

**ANSWER:** Defendants admit it intends to use manufactured pentobarbital for the execution. Defendants deny the remaining allegations contained in paragraphs 293.

294.    The weight of this readily available evidence supports that execution by a lethal dose of the pentobarbital IDOC uses from an unknown, unregulated source presents a "substantial risk of serious harm" and an "objectively intolerable risk of harm" that prevents IDOC from pleading they are subjectively blameless for the purposes of the Eighth Amendment. *See Glossip v. Gross*, 576 U.S. 863, 877 (2015).  To not be aware of these    problems is to turn a blind eye to the overwhelming evidence that executions involving pentobarbital cause flash pulmonary edema and the associated torment and terror of the feeling of drowning.  *Cf., T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (In the context of constitutional torts, supervisors can violate the Constitution themselves if they turn a blind eye for fear of what they may see).

**ANSWER:** Defendants deny the allegations contained in paragraphs 294.

295.    To be aware of the weight of evidence supporting the conclusion that lethal injection executions involving pentobarbital present a substantial risk of serious pain and suffering, and to proceed with pentobarbital executions despite this knowledge, is to intentionally inflict pain and suffering in violation of the Eighth Amendment.  This is what IDOC proposes to do with Ward's execution.

**ANSWER:** Defendants deny the allegations contained in paragraphs 295.

296.    The risks presented by Indiana's Method 2 protocol are "substantial when compared to the known and available alternative." *Glossip v. Gross*, 576 U.S.

863, 877 (2015). Ward suggests a feasible alternative to Indiana's Method 2 lethal injection protocol that can be readily implemented by the IDOC. *See Baze*, 553 U.S. at 52 ("the proffered alternatives must effectively address a 'substantial risk of harm' and the alternative must be 'feasible, readily implemented and in fact significantly reduce a substantial risk of severe pain.'").

**ANSWER:** Defendants deny the allegations contained in paragraphs 296.

297.   His alternative method is the administration of a pre-pentobarbital dose of a pain-relieving, anesthetic drugs such as opioid medication like fentanyl before the injection of pentobarbital to cause relief from pain and suffering. Fentanyl is a potent synthetic opioid drug approved by the FDA as an analgesic and anesthetic. This alternative effectively addresses the substantial risk of serious pain and suffering because an opioid pre-dose will cause unconsciousness and pain relief before the injection of pentobarbital. This method is feasible and can be readily implemented because opioid medications are ubiquitous.

**ANSWER:** Defendants deny that Ward's suggestions are feasible. Defendants are without information or knowledge to further admit or deny the remaining allegations in paragraph 297 and therefore are denied.

298.   Additionally, Ward suggests alternatives of execution by firing squad or nitrogen hypoxia.

**ANSWER:** Defendants deny that Ward's suggestions are feasible. Defendants are without information or knowledge to further admit or deny the remaining allegations in paragraph 298 and therefore are denied.

**E. Fifth Claim for Relief: Blocking Ward's view of his witnesses arbitrarily**

86

**prevents him from knowing whether the IDOC has complied with his statutory right to have his own witnesses present during his execution in violation of his due process rights under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment.**

299.  The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property, without due process of law. A violation of procedural due process involves the deprivation of a protected liberty or property interest occurring without due process. *GEFT Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 365 (2019).

**ANSWER:** These allegations do not relate to Count 4.

300.  Indiana law allows Ward to invite "not more than five (5) friends or relatives" to witness his execution. Ind. Code. § 35 -38-6-6(a)(7). Ward has a due process right to know whether Indiana is carrying out his execution in compliance with state law which includes the right to know for himself whether the people he selected as witnesses are in fact present as witnesses to his execution. It is not sufficient for prison staff to tell Ward his witnesses are present behind the glass because assurances from those obligated to follow rules that they *are* following rules will have little value to Ward who will be completely in the dark about whether the assurances are true.

**ANSWER:** These allegations do not relate to Count 4.

301.  Protection against governmental arbitrariness is the core of due process, including substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 834 (1998). Egregious executive action is arbitrary in the constitutional sense. *Id.* The cognizable level of executive abuse of power is

that which shocks the conscience. *Id.*

**ANSWER:** These allegations do not relate to Count 4.

302.    IDOC's use of one-way glass to block Ward's view of his witnesses is not done to comply with a state law prohibiting Ward from seeing his witnesses because no such law exists; it is an arbitrary decision which effectively deprives Ward of knowing if Indiana is carrying out his execution in compliance with its own laws.

**ANSWER:** These allegations do not relate to Count 4.

303.    Blocking Ward's view of his witnesses shocks the conscience because it is exceptionally cruel to deprive him of the comfort of seeing his witnesses and making one last connection with them just before he dies and it serves no legitimate purpose.

**ANSWER:** These allegations do not relate to Count 4.

304.    Blocking Ward's view of his witnesses is also cruel in violation of the Eighth Amendment's punishment clause.

**ANSWER:** These allegations do not relate to Count 4.

305.    Cruel punishments are those that involve pleasure in hurting others or involve intentional hard-heartedness, inhumanity and a lack of compassion. *See Bucklew*, 587 U.S. at 130 -131 (2019)(citing historical definitions of "cruel" to explain what cruel and unusual punishments are in the constitutional sense). Cruel punishments also involve mental pain and torment. *Id.*

**ANSWER:** These allegations do not relate to Count 4.

306.    Blocking Ward's view of his witnesses is intentionally hard-hearted and

involves inflicting unnecessary and cumulative mental pain and torment because it deprives Ward of the comfort of seeing and connecting with those closest to him as he is executed without serving any legitimate state interest. "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Hall v. Florida*, 572 U.S. 701, 707-08 (2014), quoting *Roper v. Simons,* 543 U.S. at 572. Ensuring Ward can see his witnesses during the execution is included in the governmental duty to respect the dignity of a person in his final minutes of life.

**ANSWER:** These allegations do not relate to Count 4.

## STATEMENT OF AFFIRMATIVE DEFENSES

1.      Plaintiff failed to exhaust his administrative remedies before filing this suit and therefore is barred from bringing suit under the Prison Litigation Reform Act ("PLRA").

2.      Plaintiff fails to state a claim upon which relief can be granted.

3.      Plaintiff's rights, privileges, and immunities secured under the Constitution or laws of the United States or the State of Indiana have not been violated by any alleged action, inaction, or omission of Defendants.

4.      Defendants are entitled to qualified immunity under 42 U.S.C. § 1983 with respect to any claim for damages by the Plaintiff based upon federal constitutional principles or federal law because any actions taken were objectively reasonable and did not violate clearly established principles of law.

5.    Defendants are entitled to sovereign immunity under the Eleventh Amendment.

6.    Defendants' actions or inactions were reasonably related to legitimate penological interests.

7.    Defendants are entitled to costs associated with defending this lawsuit.

8.    Defendants reserve the right to amend their Defenses as litigation progresses.

**WHEREFORE**, Defendants pray that Plaintiff takes nothing by way of his Complaint, that judgment be entered in Defendants' favor, and that this honorable Court grant Defendants all other just and proper relief.

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana
Attorney No. 18857-49

Date: September 23, 2025        By: /s/ Adrienne Pope
Adrienne Pope
Deputy Attorney General
Attorney No. 31911-49
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Phone: (317) 233-0878
Fax: (317) 232-7979
Email: Adrienne.Pope@atg.in.gov

/s/ Jefferson S. Garn
Jefferson S. Garn
Deputy Attorney General
Attorney No. 29921-49
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street

Indianapolis, IN 46204-2770
Phone: (317) 232-5933 Fax: (317) 232-7979
Email: Jefferson.Garn@atg.in.gov


Tyler Banks
Section Chief Capital and Habeas Litigation
OFFICE OF ATTORNEY GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204-2770
Phone:(317) 234-7016 Fax:(317)232-7979
Tyler.Banks@atg.in.gov